# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued April 24, 2017          Decided July 28, 2017

No. 16-1005

AMERICANS FOR CLEAN ENERGY, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND E. SCOTT
PRUITT, ADMINISTRATOR,
RESPONDENTS

E.I. DU PONT DE NEMOURS AND COMPANY, ET AL.,
INTERVENORS

———

Consolidated with 16-1044, 16-1047, 16-1049, 16-1050,
16-1053, 16-1054, 16-1056

———

On Petitions for Review of Final Action of the
United States Environmental Protection Agency

———

*Seth P. Waxman* argued the cause for petitioners
Americans for Clean Energy, et al. With him on the briefs were
*Edward N. Siskel*, *David M. Lehn*, *Saurabh Sanghvi*, *Andrew
R. Varcoe*, *Gary H. Baise*, and *Matthew W. Morrison*. *Mark C.
Kalpin* and *Robert J. McKeehan* entered appearances.

*David B. Salmons* argued the cause for petitioner National Biodiesel Board. With him on the briefs were *Bryan M. Killian* and *Sandra P. Franco*.

*Jerome C. Muys, Jr.* was on the brief for *amici curiae* American Soybean Association, et al., in support of petitioners Americans for Clean Energy, et al., and National Biodiesel Board.

*Robert A. Long*, *Jr.* argued the cause for Obligated Party Petitioners on the cellulosic biofuel and biomass-based diesel issues. With him on the briefs were *Kevin F. King*, *Stacy R. Linden*, *Thomas A. Lorenzen*, *Robert J. Meyers*, *David Y. Chung*, *Richard S. Moskowitz*, *Thomas J. Perrelli*, *David W. DeBruin*, and *Matthew E. Price*.

*Samara L. Kline* argued the cause for Obligated Party Petitioners on the point of obligation issue. With her on the briefs were *Evan A. Young*, *Shane Pennington*, *Lisa M. Jaeger*, *Richard Alonso*, *LeAnn M. Johnson*, *Albert Ferlo*, *Thomas J. Perrelli*, *David W. DeBruin*, *Matthew E. Price*, *Richard S. Moskowitz*, and *Thomas A. Lorenzen*. *Krista Hughes* and *Clara G. Poffenberger* entered appearances.

*Suzanne Murray*, *Jeremy Kernodle*, and *Alec Zacaroli* were on the brief for *amicus curiae* Small Retailers Coalition in support of Obligated Party Petitioners on the point of obligation issue.

*Lee M. Smithyman* was on the brief for *amicus curiae* CVR Energy, Inc., in support of Obligated Party Petitioners on the point of obligation issue.

*Samara M. Spence*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were

*John C. Cruden*, Assistant Attorney General at the time the brief was filed, and *Lisa M. Bell*, Attorney.

*Thomas A. Lorenzen* argued the cause for Obligated Party Respondent-Intervenors. With him on the brief were *Robert J. Meyers*, *David Y. Chung*, *Richard S. Moskowitz*, *Robert A. Long*, *Jr.*, *Kevin F. King*, *Stacy R. Linden*, *Samara L. Kline*, *Evan A. Young*, *Shane Pennington*, *Lisa M. Jaeger*, *Richard Alonso*, *David W. DeBruin*, *Thomas J. Perrelli*, and *Matthew E. Price*.

*Seth P. Waxman* argued the cause for Respondent-Intervenors Americans for Clean Energy, et al. With him on the brief were *Edward N. Siskel*, *David M. Lehn*, *Saurabh Sanghvi*, *Andrew R. Varcoe*, *Gary H. Baise*, and *Matthew W. Morrison*.

*Bryan M. Killian*, *Sandra P. Franco*, and *Daniel C. Taylor* were on the brief for intervenors E.I. du Pont de Nemours and Company and National Biodiesel Board in support of respondent. *David B. Salmons* entered an appearance.

Before: BROWN, KAVANAUGH, and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*: The Clean Air Act's Renewable Fuel Program requires an increasing amount of renewable fuel to be introduced into the Nation's transportation fuel supply each year. *See* 42 U.S.C. § 7545(*o*). By mandating the replacement – at least to a certain degree – of fossil fuel with renewable fuel, Congress intended the Renewable Fuel

Program to move the United States toward greater energy independence and to reduce greenhouse gas emissions.

EPA is the federal agency primarily responsible for implementing the Renewable Fuel Program's requirements. Congress has directed EPA to annually publish renewable fuel requirements that apply to certain participants in the transportation fuel market. In 2015, EPA promulgated a Final Rule setting several renewable fuel requirements for the years 2014 through 2017. In this set of consolidated petitions, various organizations, companies, and interest groups challenge that EPA Final Rule on a number of grounds. Some argue that EPA set the renewable fuel requirements too high. Others argue that EPA set the renewable fuel requirements too low.

We reject all of those challenges, except for one: We agree with Americans for Clean Energy and its aligned petitioners (collectively referred to as "Americans for Clean Energy") that EPA erred in how it interpreted the "inadequate domestic supply" waiver provision. We hold that the "inadequate domestic supply" provision authorizes EPA to consider *supply-side* factors affecting the volume of renewable fuel that is available to *refiners*, *blenders*, *and importers* to meet the statutory volume requirements. It does not allow EPA to consider the volume of renewable fuel that is available to ultimate *consumers* or the *demand-side* constraints that affect the consumption of renewable fuel by consumers. We therefore grant Americans for Clean Energy's petition for review of the 2015 Final Rule, vacate EPA's decision to reduce the total renewable fuel volume requirements for 2016 through use of its "inadequate domestic supply" waiver authority, and remand the rule to EPA for further consideration in light of our decision. We otherwise deny the petitions for review.

5

I

A

In 2005, Congress passed and President George W. Bush signed the Energy Policy Act. Pub. L. No. 109-58, 119 Stat. 594 (2005). Among other things, that Act established the Clean Air Act's Renewable Fuel Program. *Id.* § 1501, 119 Stat. at 1067-76 (codified as amended at 42 U.S.C. § 7545(*o*)). In 2007, Congress and President Bush amended the Renewable Fuel Program as part of the Energy Independence and Security Act. *See* Pub. L. No. 110-140, §§ 201-202, 121 Stat. 1492, 1519-28 (2007) (codified at 42 U.S.C. § 7545(*o*)). As amended, the Renewable Fuel Program requires that increasing volumes of renewable fuel be introduced into the Nation's supply of transportation fuel each year. Congress enacted those requirements in order to "move the United States toward greater energy independence and security" and "increase the production of clean renewable fuels." *Id.* preamble, 121 Stat. at 1492. Congress has vested EPA with primary responsibility for administering the Renewable Fuel Program.

As relevant here (and at the risk of oversimplification), there are six categories of actors in the renewable fuel market: (i) refiners, who manufacture conventional gasoline and diesel; (ii) renewable fuel producers, who produce fuels generated from renewable biomass; (iii) importers, who import conventional gasoline, diesel, and renewable fuels; (iv) blenders, who mix renewable fuels with conventional gasoline and diesel to create blends of more energy-efficient transportation fuel for use in vehicles; (v) retailers, who purchase the blended transportation fuel and sell it to consumers at gas stations; and (vi) consumers, who purchase transportation fuel for their vehicles at gas stations. Some actors in the market are vertically integrated, meaning that a

refiner, for example, may also operate blending facilities or fueling stations. Many market actors are not vertically integrated, however.

The Renewable Fuel Program statute contemplates that certain participants in the transportation fuel market – namely, "refineries," "blenders," and "importers" – will be required to satisfy annual "renewable fuel obligation[s]." 42 U.S.C. § 7545(*o*)(3)(B)(ii). To date, however, EPA has applied the renewable fuel obligations only to refiners and importers – not to blenders. *See* 40 C.F.R. § 80.1406(a)(1). When we refer to "obligated parties" in this opinion, we are referring to refiners and importers. To satisfy the renewable fuel obligations, each refiner and importer must ensure that a certain amount of renewable fuel is introduced into the Nation's transportation fuel supply. Each refiner and importer's renewable fuel obligation varies depending on how much fossil-based gasoline or diesel fuel it produces or imports.

The renewable fuel obligations applicable to refiners and importers mandate the introduction of four categories of renewable fuel into the transportation fuel supply. Those categories are: (i) cellulosic biofuel; (ii) biomass-based diesel; (iii) advanced biofuel; and (iv) total renewable fuel. 42 U.S.C. § 7545(*o*)(2)(B)(i)(I)-(IV). Those four fuel categories vary with respect to the renewable biomass sources from which they are derived and their greenhouse gas emissions. *See id.* § 7545(*o*)(1)(B), (D), (E), (J) (defining "advanced biofuel," "biomass-based diesel," "cellulosic biofuel," and "renewable fuel"). The statutory categories of fuel types are "nested," meaning that cellulosic biofuel and biomass-based diesel are kinds of advanced biofuel, and advanced biofuel in turn is a kind of renewable fuel that may be credited toward the total renewable fuel obligation. For example, if one million gallons of cellulosic biofuel are blended into the fuel supply, the statute

allows those one million gallons to be credited toward the advanced biofuel and total renewable fuel obligations in addition to the cellulosic biofuel obligation. *See Monroe Energy, LLC v. EPA*, 750 F.3d 909, 912 (D.C. Cir. 2014).

EPA has the responsibility to promulgate rules informing obligated parties (refiners and importers) of their annual renewable fuel obligations. *See* 42 U.S.C. § 7545(*o*)(3)(B)(i)-(ii). To do so, EPA first determines the annual volume requirement – also known as the "applicable volume" – for each category of renewable fuel. *Id.* § 7545(*o*)(2)(B). The annual volume requirement represents the total volume of renewable fuel that must be sold or introduced into the Nation's transportation fuel supply in a given year. *See Monroe Energy*, 750 F.3d at 912.

The statute contains tables that set forth the annual volume requirements for each category of renewable fuel. *See* 42 U.S.C. § 7545(*o*)(2)(B)(i). The ranges of years covered by the tables differ depending on the fuel type. For those years not covered by the statutory tables, EPA must calculate the annual volume requirements in the first instance. *See id.* § 7545(*o*)(2)(B)(ii). The statute requires EPA to determine those volume requirements, "in coordination with the Secretary of Energy and the Secretary of Agriculture, based on a review of the implementation of the program" as well as an analysis of several factors identified by statute. *Id.* EPA must promulgate the volume requirements it establishes for years not covered by the statutory tables "no later than 14 months before the first year" in which the volume requirements will apply. *Id.*

Several statutory provisions guide EPA's determination of the annual renewable fuel volume requirements. Some provisions either require or allow EPA to lower the statutory

volume requirements in specified circumstances. Three of those provisions are relevant to this case.

*First*, the "general waiver provision" allows EPA to reduce the statutory volume requirements in two circumstances. EPA may invoke the general waiver provision (i) if EPA determines that "implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States" or (ii) if EPA determines that "there is an inadequate domestic supply." *Id.* § 7545(*o*)(7)(A).

*Second*, another provision sets forth procedures EPA must follow when setting the cellulosic biofuel volume requirement. EPA must determine the "projected volume" of cellulosic biofuel that will be produced in a given compliance year. *Id.* § 7545(*o*)(7)(D)(i). If EPA's projection falls short of the statutory volume requirement for cellulosic biofuel, EPA has no choice: It "shall reduce" the cellulosic biofuel statutory volume requirement to EPA's volume projection. *Id.*

*Third*, a reduction to the cellulosic biofuel volume requirement triggers the "cellulosic waiver provision." Under that provision, when EPA must reduce the cellulosic biofuel volume requirement due to its volume projections for cellulosic biofuel, the agency "may also reduce" the advanced biofuel and total renewable fuel volume requirements "by the same or a lesser volume" as the cellulosic biofuel reduction. *Id.*

After EPA determines the volume requirements for the various categories of renewable fuel, it has a "statutory mandate" to "ensure[]" that those requirements are met. *Id.* § 7545(*o*)(3)(B)(i); *Monroe Energy*, 750 F.3d at 920. EPA fulfills that mandate by translating the annual volume requirements into "percentage standards." The percentage standards inform each obligated party of how much renewable

fuel it must introduce into U.S. commerce based on the volumes of fossil-based gasoline or diesel it imports or produces. *See Monroe Energy*, 750 F.3d at 912. The percentage standards represent the percentage of transportation fuel introduced into commerce that must consist of renewable fuel. *Id.* If each obligated party meets the required percentage standards, then the Nation's overall supply of cellulosic biofuel, biomass-based diesel, advanced biofuel, and total renewable fuel will meet the total volume requirements set by EPA.

For present purposes, it is sufficient to understand that the percentage standards are used by obligated parties (refiners and importers) to calculate their individual compliance obligations under the Renewable Fuel Program. By statute, EPA is required to promulgate the percentage standards for a given year no later than November 30 of the preceding calendar year. *See* 42 U.S.C. § 7545(*o*)(3)(B)(i).

Once EPA issues a rule informing obligated parties (refiners and importers) of their renewable fuel obligations, it is up to the obligated parties to comply with the statute. But obligated parties need not themselves introduce renewable fuel into transportation fuel to comply with their renewable fuel obligations. Rather, to facilitate flexible and cost-effective compliance with the Renewable Fuel Program's requirements, Congress directed EPA to establish a "credit program" through which obligated parties can acquire and trade credits and thereby comply with the statute. *Id.* § 7545(*o*)(5) (capitalization altered); *see also Monroe Energy*, 750 F.3d at 912.

The credits in the trading program established by EPA are known as "RINs" – short for "Renewable Identification Numbers." *Monroe Energy*, 750 F.3d at 913; *see also* 40

C.F.R. § 80.1401. To simplify for present purposes, each batch of renewable fuel that is produced or imported for use in the United States is assigned a unique set of RINs "that correspond to the volume of ethanol-equivalent fuel gallons in that batch." *Monroe Energy*, 750 F.3d at 913. As relevant here, RINs ordinarily remain attached to the fuel until the fuel is purchased by an obligated party – that is, by a refiner or importer – or blended into a transportation fuel. *See* 40 C.F.R. § 80.1429(b)(1)-(2). At that point, the RINs become "separated" from the associated volumes of renewable fuel. *Id.* § 80.1429(b). Once separated, RINs may be retained by the party who possesses them or sold or traded on the open RIN market.

Obligated parties (refiners and importers) comply with their renewable fuel obligations by accumulating or purchasing the requisite number of RINs and then "retiring" the RINs in an annual compliance demonstration with EPA. *Monroe Energy*, 750 F.3d at 913 (citing 40 C.F.R. § 80.1427(a)). If an obligated party has more RINs than it needs to meet its renewable fuel obligation, the obligated party may sell or trade the extra RINs or instead choose to "bank" the RINs for use in the next compliance year. *Id.*; *see also* 42 U.S.C. § 7545(*o*)(5)(B); 40 C.F.R. §§ 80.1425-29. RINs "banked" by an obligated party for use in the subsequent compliance year are known in the industry as "carryover" RINs. If, by contrast, an obligated party does not have enough RINs to meet its renewable fuel obligation, it may: (i) attempt to purchase any RINs it needs on the open RIN market; (ii) use carryover RINs it has from the prior year to meet some portion of its obligation; or (iii) carry a renewable fuel deficit forward into the next compliance year, provided that some conditions are met. *See* 42 U.S.C. § 7545(*o*)(5)(D); 40 C.F.R. § 80.1427(b); *see also Monroe Energy*, 750 F.3d at 913.

B

In December 2015, EPA promulgated the Final Rule that is under review in this case. *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015) (hereinafter Final Rule). The Final Rule, which followed a proposed rule issued by EPA in June 2015, established volume requirements and the resulting percentage standards for the years 2014, 2015, and 2016 for all four categories of renewable fuel. *See id.* at 77,422 tbl.I-1, 77,512 tbl.V.B.3-2. The Final Rule also set the biomass-based diesel volume requirement for the year 2017. *See id.* at 77,422 tbl.I-1.

EPA began its analysis in the Final Rule by explaining the competing concerns implicated by the Renewable Fuel Program's requirements. EPA noted that the "fundamental objective" of the Renewable Fuel Program "is clear: To increase the use of renewable fuels in the U.S. transportation system every year through at least 2022." *Id.* at 77,421. According to EPA, Congress's decision in the statute "to mandate increasing and substantial amounts of renewable fuel" use "clearly signals" that Congress intended "to create incentives to increase renewable fuel supplies and overcome constraints in the market." *Id.* at 77,423.

EPA noted that the Renewable Fuel Program's requirements were "readily achieved" in the few years after Congress created the program in 2005 and amended it in 2007. *Id.* That was due in large part to the fact that the industry had the capacity to produce – and the market had the capacity to consume – increasing quantities of ethanol. *Id.* But by 2014, ready compliance with the statutory volume requirements was no longer possible. That is because the industry hit the "E10 blendwall": an "infrastructure and market-related constraint on

ethanol demand" that "arises because most U.S. vehicle engines were not designed to handle gasoline consisting of more than 10 percent ethanol." *Monroe Energy*, 750 F.3d at 913-14. Put differently, a few years into the amended Renewable Fuel Program, the supply of ethanol was much greater than the demand in the market.

Citing the E10 blendwall problem, EPA explained that obligated parties must increasingly rely on "sustained growth in the development and use of advanced, non-ethanol renewable fuels" (referred to as advanced biofuels) to meet their renewable fuel obligations. Final Rule, 80 Fed. Reg. at 77,423. However, EPA further noted that there were significant "real-world constraints" on the market's ability to consume increasing volumes of advanced biofuel. *Id.* at 77,422. Those constraints, according to EPA, meant that "the amount of renewable fuel that can be produced and imported is larger than the volume that can be consumed." *Id.* at 77,423. EPA cited those demand-side constraints as evidence that "[t]rying to force growth" at the rates set by the statutory volume requirements would "prove infeasible." *Id.*

In the Final Rule, EPA therefore adopted an approach that it believed properly balanced its statutory duty to "drive growth" in the supply of renewable fuels with the "real-world constraints" on the market's ability to produce and consume renewable fuels. *Id.* at 77,422-23.

To start, EPA acknowledged that its Final Rule was late given EPA's statutory deadlines. As relevant here, EPA did not meet the statutory deadlines for issuing the 2014 or the 2015 percentage standards or for issuing any of the biomass-based diesel volume requirements. *Id.* at 77,430. EPA argued that, despite its delay, it could permissibly promulgate all of the standards and requirements in the Final Rule. *See id.*

As support for that conclusion, EPA cited this Court's decisions in *National Petrochemical & Refiners Association v. EPA*, 630 F.3d 145 (D.C. Cir. 2010), and *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014). EPA asserted that, under those decisions, it had statutory authority to issue the late requirements. EPA also asserted that it had exercised its statutory authority reasonably by mitigating any unfair or retroactive effects of the late rule. EPA claimed that it had done so in part by: (i) setting the 2014 and 2015 volume requirements based on the actual volumes of renewable fuel that were introduced and available for compliance with the renewable fuel volume obligations during those years and (ii) extending the 2014 and 2015 compliance deadlines. *See* Final Rule, 80 Fed. Reg. at 77,430-31, 77,491-92.

Because EPA concluded that its lateness did not deprive it of authority to act, EPA proceeded with the task of setting the annual volume requirements. With respect to cellulosic biofuel, EPA projected that the volume of cellulosic biofuel produced in the year 2016 would fall short of the statutory volume requirement. *See id.* at 77,508 tbl.IV.F-4. As required by the statute, EPA reduced the cellulosic biofuel volume requirement to match its projection. *See id.* at 77,499 tbl.IV-1. EPA also promulgated biomass-based diesel volume requirements for 2014 through 2017. *Id.* at 77,422 tbl.I-1; *see also id.* at 77,496 tbl.III-D.5-1.

EPA also set volume requirements for advanced biofuel and total renewable fuel. In approaching that task, EPA explained its view that the volume requirements should reflect the amount of total renewable fuel and advanced biofuel that could be incorporated into the market given the "real-world constraints" on both the supply of *and* demand for renewable fuel. *Id.* at 77,422; *see also id.* at 77,426, 77,431-39. For

purposes of determining the available supply of renewable fuel, EPA considered only the actual volumes of renewable fuel both introduced and available for compliance with the statutory requirements in a given year. It did not consider the availability of carryover RINs from prior years. *See id.* at 77,482-87.

Applying that approach, EPA concluded that "the volumes for advanced biofuel and total renewable fuel specified in the statute cannot be achieved in 2014, 2015, or 2016." *Id.* at 77,431. EPA therefore relied upon its (i) cellulosic waiver authority and (ii) general waiver authority to reduce the volume requirements for total renewable fuel and advanced biofuel.

*First*, EPA used its cellulosic waiver authority to significantly reduce the statutory volume requirements for advanced biofuel and total renewable fuel. EPA noted that the cellulosic waiver provision grants the agency "broad discretion" to decide "when and under what circumstances to reduce the advanced and total renewable fuel" volume requirements when it reduces the cellulosic biofuel volume requirement. *Id.* at 77,434. EPA determined that, due to various constraints on the ability of the market to produce and consume *non-cellulosic* advanced biofuels, non-cellulosic advanced biofuels could not entirely make up for the shortfall created by EPA's reduction of the cellulosic biofuel volume requirement. *See id.* at 77,426, 77,434. EPA therefore relied on its cellulosic waiver authority to lower the advanced biofuel and total renewable fuel volume requirements for the years 2014, 2015, and 2016. *Id.* at 77,434, 77,439.

*Second*, EPA made additional reductions to the total renewable fuel volume requirements using the "inadequate domestic supply" prong of its general waiver authority. *See id.* at 77,434-39. EPA noted that it had "never before" interpreted the "inadequate domestic supply" provision for purposes of

deciding whether to reduce a total renewable fuel volume requirement. *Id.* at 77,435. Proceeding with its first-ever interpretation, EPA concluded that the phrase "inadequate domestic supply" is ambiguous because it "does not specify what the general term 'supply' refers to." *Id.*

Exercising its authority to resolve that purported ambiguity, EPA concluded that the phrase "inadequate domestic supply" is best read to refer to "the adequacy of supply of renewable fuel" available to "the ultimate consumer[s]" of renewable fuel blended into transportation fuel. *Id.* at 77,436. EPA also concluded that its authority to determine the adequacy of the renewable fuel "supply" allowed the agency to look not only to supply-side factors in the market for renewable fuel – such as constraints on the production or import of renewable fuel – but also at factors affecting *demand for renewable fuel by consumers* – such as vehicle engine warranties and the effectiveness of those businesses marketing renewable fuel products. *See id.* at 77,435, 77,452 tbl.II.E.1-1. Analyzing those factors, EPA concluded that the available supply of total renewable fuel still fell short of the statutory volume requirements, even after those requirements were reduced through use of the cellulosic waiver authority. *Id.* at 77,439. EPA therefore relied on the "inadequate domestic supply" waiver provision to further reduce the 2014, 2015, and 2016 total renewable fuel volume requirements. *Id.*

Below is a table summarizing the total renewable fuel volume requirements (in billions of gallons) issued by EPA in the Final Rule. For each year, the table lists the statutory volume requirements; the reduction to those statutory requirements attributable to EPA's use of the cellulosic waiver provision and the general waiver provision; the final volume requirements set by EPA; and the total reduction to the

statutory volume requirements made by EPA through use of its waiver authorities.

Table 1.1 – Total Renewable Fuel Volume Requirements
(in billions of gallons)

| **Total Renewable Fuel Volume Requirements** | | | | | |
|---|---|---|---|---|---|
| Year | Statute | Cellulosic Waiver Reduction | General Waiver Reduction | EPA Rule | Total Reduction from Waivers |
| *2014* | 18.15 | 1.08 | .79 | 16.28 | 1.87 |
| *2015* | 20.5 | 2.62 | .95 | 16.93 | 3.57 |
| *2016* | 22.25 | 3.64 | .5 | 18.11 | 4.14 |

Finally, although EPA in the Final Rule focused most of its discussion on the volume requirements and percentage standards, EPA did note that it had received comments regarding the current "point of obligation" – that is, EPA's decision to place the compliance burden on refiners and importers, but not blenders. EPA stated its view that those comments were "beyond the scope" of the rulemaking because EPA "did not propose any changes to the definition of an obligated party" nor "seek comment on this issue." *Id.* at 77,431; EPA Response to Comments on Final Rule, at 883 (Nov. 2015), J.A. 1027. EPA therefore declined to address comments related to the point of obligation. *See* Final Rule, 80 Fed. Reg. at 77,431.

## C

Following EPA's issuance of the Final Rule in December 2015, a number of parties filed petitions for review in this Court. Two petitions – one filed by National Biodiesel Board and the other filed by a group of petitioners including Americans for Clean Energy – challenge EPA's Final Rule for setting the renewable fuel volume requirements at too low a level. From the other direction, a number of petitions – filed by a group of obligated parties and industry associations that we will call the "Obligated Party Petitioners" – challenge EPA's Final Rule for setting the renewable fuel volume requirements at too high a level and for refusing to address the proper point of obligation.

We now consider those petitions and the issues they present. The opinion proceeds as follows.

In Part II, we address Americans for Clean Energy's challenge to EPA's interpretation of the "inadequate domestic supply" waiver provision. We agree with Americans for Clean Energy that the term "inadequate domestic supply" refers to the supply of renewable fuel available to refiners, blenders, and importers to meet the statutory volume requirements. We hold that EPA exceeded its authority under the "inadequate domestic supply" provision when it interpreted the term "supply" to allow it to consider demand-side constraints in the market for renewable fuel. We therefore vacate EPA's decision to reduce the total renewable fuel volume requirements for 2016 through use of the "inadequate domestic supply" waiver authority and remand the rule to the agency for further consideration in light of our decision.

We also consider Americans for Clean Energy's argument that EPA was required to consider "carryover RINs" for

purposes of determining whether there is an "inadequate domestic supply" of renewable fuel. We reject that challenge, as we conclude that the statute does not require EPA to consider carryover RINs for purposes of the "inadequate domestic supply" provision.

In Part III, we consider the issues arising from EPA's delay in promulgating the Final Rule. *First*, EPA used actual renewable fuel volumes to set the 2014 and 2015 volume requirements in order to minimize the hardship to obligated parties caused by the late issuance of the Final Rule. In doing so, EPA acted reasonably under the circumstances. We therefore reject National Biodiesel Board's and Americans for Clean Energy's arguments to the contrary. *Second*, EPA's late issuance of the biomass-based diesel volume requirements was permissible. Contrary to the arguments of the Obligated Party Petitioners, we conclude that EPA had statutory authority to issue the late biomass-based diesel volume requirements and exercised that authority reasonably.

In Part IV, we consider and reject the Obligated Party Petitioners' arbitrary and capricious challenges to the 2016 cellulosic biofuel projections. We conclude that EPA's cellulosic biofuel projection methodology was permissible under our precedents and otherwise reasonable and reasonably explained.

In Part V, we consider and reject National Biodiesel Board's contention that EPA violated its statutory authority when interpreting and applying the cellulosic waiver provision. Based on this Court's analysis in *Monroe Energy*, we conclude that the text of the cellulosic waiver provision affords EPA "broad discretion" to consider a variety of factors – including demand-side constraints in the market for advanced biofuel – when determining "whether and in what circumstances to

reduce" volume requirements through use of the cellulosic waiver authority. 750 F.3d at 915. We also deny National Biodiesel Board's related arbitrary and capricious challenges to EPA's projection of the volume of advanced biofuel "reasonably attainable" in the market in the year 2016. Final Rule, 80 Fed. Reg. at 77,427.

In Part VI, we conclude that we need not resolve whether EPA's failure to address the proper point of obligation in the Final Rule necessitates a remand of the rule to the agency.

II

We first address whether EPA permissibly interpreted the "inadequate domestic supply" prong of its general waiver authority when lowering total renewable fuel volume requirements for the years 2014, 2015, and 2016. Americans for Clean Energy argues that EPA's interpretation of the phrase "inadequate domestic supply," under which EPA considered *demand-side* factors affecting the amount of renewable fuel available to *consumers*, is inconsistent with the statute. We agree with Americans for Clean Energy.

Americans for Clean Energy also contends that EPA is required to consider carryover RINs for purposes of determining whether there is an "inadequate domestic supply" of renewable fuel during a given year. On that point, we side with EPA and conclude that the agency permissibly declined to consider carryover RINs for purposes of determining the available supply of total renewable fuel for the years 2014, 2015, and 2016.

20

A

1

The Renewable Fuel Program requires increasing volumes of renewable fuel to be introduced into the Nation's transportation fuel market. That market consists of a number of actors that play a part in delivering transportation fuel to consumers for use in their vehicles. There are refiners and importers, who manufacture and import conventional fossil-based gasoline and diesel fuels. In addition, there are biofuel producers, who manufacture the various categories of renewable fuel mandated by the Renewable Fuel Program. There are fuel blenders, who purchase fossil-based fuels and renewable fuels and mix the two together to create blended transportation fuels. There are retail fueling stations, who purchase blended transportation fuels and sell those fuels to consumers. And there are the consumers, who purchase transportation fuels for use in their vehicles. Although some market participants are vertically integrated – a refining company may also operate blending facilities or fueling stations, for example – many are not.

In enacting the Renewable Fuel Program, Congress chose not to place any compliance burdens on the fueling stations or consumers of transportation fuel. Instead, the statute allows EPA to designate three categories of upstream market participants – "refineries," "blenders," and "importers" – as "obligated parties" responsible for ensuring that the renewable fuel volume requirements are met. 42 U.S.C. § 7545(*o*)(3)(B)(ii)(I). To date, EPA has applied the renewable fuel obligations only to refiners and importers of fuel – not to blenders. *See* 40 C.F.R. § 80.1406(a)(1). By requiring upstream market participants such as refiners and importers to introduce increasing volumes of renewable fuel into the

transportation fuel supply, Congress intended the Renewable Fuel Program to be a "market forcing policy" that would create "'demand pressure' to increase consumption" of renewable fuel. Final Rule, 80 Fed. Reg. at 77,423; *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 917 (D.C. Cir. 2014) (quoting Regulation of Fuels and Fuel Additives: 2013 Renewable Fuel Standards, 78 Fed. Reg. 49,794, 49,821 (Aug. 15, 2013)).

Refiners and importers demonstrate their compliance with the statute by accumulating the requisite number of renewable fuel credits, known as RINs. Each set of RINs corresponds to a batch of renewable fuel produced or imported for use in the United States. As relevant here, RINs generally remain attached to a volume of fuel until the fuel is: (i) purchased by an obligated party – that is, by a refiner or importer – or (ii) blended into a transportation fuel by a blender. 40 C.F.R. § 80.1429(b)(1)-(2). When either of those two things occurs, RINs become "separated" from the associated volume of renewable fuel. *Id.* § 80.1429(b). Those separated RINs, in turn, are accumulated by refiners and importers in order to demonstrate compliance with the Renewable Fuel Program's requirements. *See id.* § 80.1427(a)(1).

Therefore, individual refiners and importers have options when it comes to demonstrating compliance with their statutory obligations. Some may choose to comply with the statute by purchasing or blending renewable fuel themselves. Other parties may comply with the statute by purchasing the separated RINs generated, among other ways, when blenders mix renewable and fossil-based fuels to create blended transportation fuels. No matter how individual obligated parties choose to comply with the statute, however, the key point for present purposes is this: Refiners and importers are able to meet the Renewable Fuel Program's industry-wide

statutory volume requirements only if an adequate volume of renewable fuel is available to refiners, importers, and blenders.

2

Although the Renewable Fuel Program statute establishes the annual volume requirements for the different categories of renewable fuel, Congress also granted EPA "waiver" power to reduce the statutory volume requirements in certain circumstances. Here, we consider the statute's "inadequate domestic supply" waiver provision. That provision is located within a section establishing EPA's general waiver authority. The provision gives EPA discretion to "waive" the statutory requirements applicable to obligated parties "in whole or in part" by "reducing the national quantity of renewable fuel required under paragraph (2) . . . based on a determination by the Administrator, after public notice and opportunity for comment, *that there is an inadequate domestic supply*." 42 U.S.C. § 7545(*o*)(7)(A) (emphasis added).[1]

---

[1] The general waiver provision reads in full:

The Administrator, in consultation with the Secretary of Agriculture and the Secretary of Energy, may waive the requirements of paragraph (2) in whole or in part on petition by one or more States, by any person subject to the requirements of this subsection, or by the Administrator on his own motion by reducing the national quantity of renewable fuel required under paragraph (2) –

(i) based on a determination by the Administrator, after public notice and opportunity for comment, that implementation of the requirement would severely harm the economy or environment of a State, a region, or the United States; or

Before the 2015 Final Rule, EPA had never relied upon the "inadequate domestic supply" waiver provision to reduce a statutory volume requirement. *See* Final Rule, 80 Fed. Reg. at 77,435. In the 2015 Final Rule, EPA relied on that provision to reduce the total renewable fuel volume requirements for the years 2014, 2015, and 2016. *See id.* at 77,439. In so doing, EPA issued its first-ever interpretation of the term "inadequate domestic supply" for the purposes of establishing a renewable fuel volume requirement. *Id.* at 77,435.

EPA began by noting its view that the statutory phrase "inadequate domestic supply" is ambiguous. *Id.* That is so, according to EPA, because the text "does not specify" what "product" or "person" the "general term 'supply' refers to." *Id.* Having concluded that the phrase "inadequate domestic supply" is ambiguous, EPA stated that it had interpretive authority to adopt a reading of the waiver provision that would best align with "the overall policy goals" of the Renewable Fuel Program. *Id.* at 77,436. That "best" reading has two important elements that we consider here. *Id.* at 77,435.

*First*, EPA concluded that the best reading of the "inadequate domestic supply" provision is that it refers to the supply of renewable fuel available to *consumers* for use in their vehicles – not to the supply of renewable fuel available to *refiners, blenders, and importers* for use in meeting the statutory volume requirements. *See id.* at 77,435-36. Under that interpretation, EPA considered all factors that would affect the amount of renewable fuel available for sale to consumers

---

(ii) based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply.

42 U.S.C. § 7545(*o*)(7)(A).

including, among other things, the capacity and incentives of transportation fuel distributors and retail gas stations to distribute and sell blended transportation fuel. *See id.* at 77,452 tbl.II.E.1-1.

*Second*, EPA concluded that the "inadequate domestic supply" waiver provision grants it authority not only to consider supply-side constraints affecting the availability of renewable fuel – such as renewable fuel production or import capacity – but also to consider *demand-side* factors affecting consumers' desire or ability to consume renewable fuels. *Id.* at 77,435-36. Those demand-side factors included, among other things, the "existence of and expansion of" vehicles and engines "capable of using" renewable fuel; the number of "retail outlets that offer renewable fuels blends"; "the attractiveness" of renewable fuel blends "to consumers"; and the "marketing effectiveness" of those promoting renewable fuel products. *Id.* at 77,452 tbl.II.E.1-1, 77,460 (capitalization altered).

An example helps crystallize the effects of EPA's interpretation. Suppose four things for a given year: (i) the statutory volume requirement is 10 million gallons; (ii) a supply of 10 million gallons of renewable fuel is available for use by refiners, blenders, and importers to meet the statutory volume requirement; (iii) due to distribution constraints, fuel retailers can make nine million gallons of renewable fuel available to consumers; and (iv) consumers can use – and therefore demand – eight million gallons of renewable fuel. Under EPA's interpretation of the "inadequate domestic supply" provision, EPA would be authorized: (i) to reduce the statutory volume requirement by one million gallons based on the distribution constraints that limit the amount of fuel offered by fuel retailers to consumers and (ii) to further reduce the volume requirement by an additional one million gallons to

reflect consumer *demand* for renewable fuel. Those reductions could be made, according to EPA, notwithstanding the fact that the renewable fuel *supply* of 10 million gallons would be adequate to allow refiners, blenders, and importers to introduce enough renewable fuel into the Nation's fuel supply to meet the statutory volume requirement.

3

Americans for Clean Energy argues that EPA's interpretation of the phrase "inadequate domestic supply" is inconsistent with the text, structure, and purpose of the Renewable Fuel Program. According to Americans for Clean Energy, the scope of EPA's "inadequate domestic supply" waiver authority is clear: It authorizes EPA to consider *supply-side* factors affecting the volume of renewable fuel that is available to *refiners, blenders, and importers* to meet the statutory volume requirements. It does not, according to Americans for Clean Energy, allow EPA to consider factors, such as distribution capacity, affecting the supply of renewable fuel available to ultimate *consumers* for use in their vehicles. Nor does it allow EPA to consider *demand-side* constraints on the consumption of renewable fuel when determining the available renewable fuel supply.

We agree with Americans for Clean Energy that EPA's interpretation of the "inadequate domestic supply" waiver provision is inconsistent with the statute. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 & n.9 (1984).

To begin, EPA was wrong when it concluded that "inadequate domestic supply" may be read to refer to the supply of renewable fuel available to consumers for use in their vehicles rather than to the supply of renewable fuel available

to refiners, blenders, and importers to meet the statutory volume requirements. EPA's interpretation rests on the premise that the "inadequate domestic supply" waiver provision is ambiguous with respect to the "product" and "person" at issue. Final Rule, 80 Fed. Reg. at 77,435. That is not the case.

The "inadequate domestic supply" provision authorizes EPA to "reduc[e] the national quantity of *renewable fuel* required" by the statute "based on a determination by" EPA "that there is an inadequate domestic supply." 42 U.S.C. § 7545(*o*)(7)(A) (emphasis added). Reading the "inadequate domestic supply" provision together with the section it modifies, the only reasonable interpretation is that the "product" at issue is the only product referenced in the provision: "renewable fuel."

Nor is the "inadequate domestic supply" waiver provision ambiguous with respect to the "person" at issue. Recall that the statute allows EPA to apply the annual renewable fuel obligations to three kinds of entities – refiners, blenders, and importers. *See id.* § 7545(*o*)(3)(B)(ii)(I). As discussed, EPA has chosen to obligate only refiners and importers. But all three entities – refiners, blenders, and importers – play a part in ensuring that statutory volume requirements are met: refiners and importers by purchasing or importing sufficient volumes of renewable fuel, and blenders by blending sufficient volumes of renewable fuel with fossil-based fuel to produce transportation fuels. *See* 40 C.F.R. § 80.1429(b)(1)-(2). Thus, it is the *refiners, blenders, and importers* – not consumers – who must "use" the statutorily required volumes of renewable fuel by incorporating that fuel into the Nation's supply of transportation fuel. It follows that it is the *refiners, blenders, and importers* – not consumers – who must have access to an adequate "supply" of renewable fuel in order to meet the

Renewable Fuel Program's statutory volume requirements. When the supply of renewable fuel is "inadequate" to allow refiners, blenders, and importers to introduce enough renewable fuel to meet the statutory volume requirements, the "inadequate domestic supply" waiver provision allows EPA to reduce those requirements to reflect that fact. That reduction, in turn, benefits obligated parties – not consumers.

In other words, the "inadequate domestic supply" waiver provision is just that: a waiver provision. It authorizes EPA to ease the Renewable Fuel Program's requirements when complying with those requirements would be infeasible. With that understanding of how the "inadequate domestic supply" provision operates in the statutory scheme, EPA's reading of the provision makes little sense: Whether consumers have an adequate supply of renewable fuel to fill their cars is not relevant to whether refiners, blenders, and importers have an adequate supply of renewable fuel to meet the statutory volume requirements. For purposes of measuring available "supply," the "persons" at issue are refiners, blenders, and importers.

A comparison of the "inadequate domestic supply" provision with other statutory provisions related to renewable fuel supports that conclusion. As discussed, under EPA's interpretation of the "inadequate domestic supply" provision, the agency may consider factors relating to the ability of distributors and fuel retailers to distribute and sell renewable fuel to downstream consumers. But in a number of nearby provisions, Congress explicitly authorized EPA to consider constraints on both the supply *and distribution* of a material. *See, e.g.*, 42 U.S.C. § 7545(*o*)(8)(B) (directing Secretary of Energy to evaluate the "supply *and distribution system capabilities*" to help assist EPA in making a waiver determination for the first year of the Renewable Fuel Program) (emphasis added); *id.* § 7545(m)(3)(C) (authorizing

EPA to delay oxygenated fuel requirements if "there is, or is likely to be, for any area, an inadequate domestic supply of, *or distribution capacity for*, oxygenated gasoline meeting the requirements" and requiring EPA to "consider distribution capacity separately from the adequacy of domestic supply") (emphasis added). Those examples reveal that when Congress intended to allow EPA to consider downstream distribution capacity in addition to supply, it "left little doubt in the matter." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723, slip op. at 6 (2017).

The drafting history of the "inadequate domestic supply" provision, to the extent it is relevant, counts as yet another strike against EPA's interpretation. The version of the Energy Policy Act passed by the House would have allowed EPA to reduce the statutory volume requirements "based on a determination by the Administrator, after public notice and opportunity for comment, that there is an inadequate domestic supply *or distribution capacity to meet the requirement*." H.R. 6, 109th Cong. sec. 1501(a)(2), § 7545(*o*)(8)(A)(ii) (as calendared in Senate, June 9, 2005) (emphasis added). The latter portion of the waiver provision – which would have allowed EPA to consider "distribution capacity" – was dropped in the version of the bill passed by the Senate. *See* H.R. 6, 109th Cong. sec. 211(a)(2), § 7545(*o*)(7)(A)(ii) (as passed by Senate, June 28, 2005). As relevant here, the House agreed to the Senate's amendment to the bill. *See* H.R. Rep. No. 109-190, at 1, 486 (2005) (Conf. Rep.). The "distribution capacity" language does not appear in the final version of the Act. *See* Energy Policy Act of 2005, Pub. L. No. 109-58, sec. 1501(a)(2), § 7545(*o*)(7)(A)(ii), 119 Stat. 594, 1072. Congress's decision to drop the "distribution capacity" language counsels against EPA's reading in this case, which in effect would add that kind of language back into the waiver

provision by allowing EPA to consider factors affecting the distribution of renewable fuel to retailers and consumers.

Therefore, it is evident that the "inadequate domestic supply" waiver provision refers to the supply of renewable fuel available to refiners, blenders, and importers to meet the statutory volume requirements. Under that reading, EPA may consider factors affecting the availability of renewable fuel to refiners, blenders, and importers. Those factors may include, for example, the availability of feedstocks used to make renewable fuel, the production capacity of renewable fuel producers, the amount of renewable fuel available for import from foreign producers, or the infrastructure capacity needed to get renewable fuel from producers to refiners, importers, and blenders. *See* Final Rule, 80 Fed. Reg. at 77,451-52 tbl.II.E.1-1. EPA may not consider, however, those factors affecting the availability of renewable fuel to market actors downstream from refiners, importers, and blenders, such as fuel retailers or consumers. Those prohibited factors include, for example, constraints on the infrastructure needed to distribute fuel from blenders to gas stations or the number of retail outlets that offer renewable fuel blends.

The problems with EPA's interpretation do not end there. In the Final Rule, EPA concluded that the "inadequate domestic supply" waiver provision gives it authority not only to evaluate those factors affecting the *supply* of renewable fuel – such as feedstock availability, renewable fuel production capacity, and renewable fuel import capacity – but also to consider factors affecting the *demand* for renewable fuel – such as pricing of renewable fuel, prevalence of vehicle engines that can use renewable fuel, and marketing efforts of those promoting renewable fuel products. *See id.* at 77,435-36, 77,451-52 tbl.II.E.1-1. That interpretation, which in effect amends "inadequate domestic *supply*" to read "inadequate

domestic *supply and demand*," also exceeds EPA's statutory authority.

The text of the "inadequate domestic supply" waiver provision all but resolves this issue. As even EPA concedes, the "common understanding" of the term "supply" is "an amount of a resource or product that is available for use by the person or place at issue." *Id.* at 77,435; *see also id.* at 77,435 n.32 (collecting dictionary definitions); THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2017 online) (an "amount available or sufficient for a given use"). When it comes to the "inadequate domestic supply" provision, we have already established: (i) that the "resource or product" is renewable fuel; (ii) that the "use" is compliance with the statute; and (iii) that the "persons" "at issue" are refiners, blenders, and importers. Putting that together, "supply" as used in the "inadequate domestic supply" provision refers to the "amount" of renewable fuel that is "available for use" by refiners, blenders, and importers in meeting the statutory volume requirements.

Importantly, whether a thing is "available" to someone has nothing to do with whether he or she decides to use it. (The fact that a person is on a diet does not mean that there is an inadequate supply of food in the refrigerator.) So too here: Whether there is an adequate amount of renewable fuel available to allow refiners, blenders, and importers to meet the statutory volume requirements has little to do with how much renewable fuel that refiners, blenders, and importers – much less consumers at the pump – ultimately decide to use.

EPA counters that, as a practical matter, it is unrealistic to delink "supply" and "demand." EPA argues that the "supply" of a product is a function of the "demand" for that product, and that it may therefore consider demand-side factors when

deriving the available supply of renewable fuel. EPA's argument falls apart in view of the operation and structure of this statute's renewable fuel requirements.

The central problem with EPA's "supply equals demand" argument (in addition to the text of the statute, of course) is that it runs contrary to how the Renewable Fuel Program is supposed to work. By setting annual renewable fuel volume requirements that increase progressively each year, Congress adopted a "market forcing policy" intended to "overcome constraints in the market" by creating "demand pressure to increase consumption" of renewable fuels. Final Rule, 80 Fed. Reg. at 77,423; *Monroe Energy*, 750 F.3d at 917 (internal quotation marks omitted). Therefore, as EPA recognized in a previous rulemaking, demand for renewable fuel "will be a function of the" renewable fuel standards "set" by EPA. Regulation of Fuels and Fuel Additives: 2011 Renewable Fuel Standards, 75 Fed. Reg. 76,790, 76,803 (Dec. 9, 2010). In other words, the Renewable Fuel Program's increasing requirements are designed to force the market to create ways to produce and use greater and greater volumes of renewable fuel each year. EPA's interpretation of the "inadequate domestic supply" provision flouts that statutory design: Instead of the statute's volume requirements forcing demand up, the lack of demand allows EPA to bring the volume requirements down. "No argument" that EPA has "offered here supports that goal-defying (much less that text-defying) statutory construction." *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1662, slip op. at 14 (2017).

In short, applying the "traditional tools" of statutory interpretation, we conclude that the "inadequate domestic supply" waiver provision refers to the supply of renewable fuel available to refiners, blenders, and importers to meet the statutory volume requirements. *Chevron*, 467 U.S. at 843 n.9.

We also conclude that, for purposes of examining whether the supply of renewable fuel is adequate, the "inadequate domestic supply" provision authorizes EPA to consider only supply-side factors – such as production and import capacity – affecting the available supply of renewable fuel. The "inadequate domestic supply" provision does not authorize EPA to consider demand-side factors affecting the demand for renewable fuel.

4

EPA presses three primary arguments in an attempt to counter the conclusion dictated by the text and structure of the Renewable Fuel Program statute. None is convincing.

*First*, EPA argues that the statutory definition of "renewable fuel" supports its position. The statute defines "renewable fuel" as "fuel that is produced from renewable biomass and *that is used* to replace or reduce the quantity of fossil fuel present in a transportation fuel." 42 U.S.C. § 7545(*o*)(1)(J) (emphasis added). Latching on to the words "that is used," EPA argues that biofuel qualifies as "renewable fuel" only if it is "actually used to replace fossil-based transportation fuels." Final Rule, 80 Fed. Reg. at 77,435. From that premise, EPA argues that its interpretation of "inadequate domestic supply" is permissible because it focuses on the point at which renewable fuel is "actually used" to replace fossil-based transportation fuels – namely, when "ultimate consumers" fuel their cars at the gas pump. *Id.*; *see also id.* at 77,435 n.33.

We reject EPA's attempt to bootstrap the definition of "renewable fuel" into a boundless general waiver authority. Contrary to EPA's contention, the phrase "that is used" in the definition of "renewable fuel" does not mean that biofuel transforms into renewable fuel only when it is actually pumped

into gas tanks. Rather, as Americans for Clean Energy explains, the "term 'used' merely defines the qualifying uses to which the biofuel may be put." Americans for Clean Energy Br. 15. The definition clarifies, for instance, that "renewable fuel" is biofuel used in "transportation fuel," whereas "additional renewable fuel" is biofuel used in "home heating oil or jet fuel." *Compare* 42 U.S.C. § 7545(*o*)(1)(J), *with id.* § 7545(*o*)(1)(A). Notably, it is EPA's reading of the "renewable fuel" definition that glosses over the statutory text: For the most part, biofuel "is used to replace or reduce the quantity of fossil fuel present *in a transportation fuel*" when blenders mix biofuel with fossil-based fuel to create a blended transportation fuel – not, as EPA claims, when consumers pump transportation fuels into their cars. *Id.* § 7545(*o*)(1)(J) (emphasis added).

*Second*, EPA contends that interpreting "supply" to refer to the amount of renewable fuel available to refiners, blenders, and importers in effect reads "supply" to mean "production." That interpretation is not correct, according to EPA, because "other fuel related provisions of the Clean Air Act" distinguish between "capacity to produce" and "capacity to supply" fuel. Final Rule, 80 Fed. Reg. at 77,436 (comparing 42 U.S.C. § 7545(k)(6)(A)(ii) with *id.* § 7545(k)(6)(B)(iii)(I)). EPA is correct that, in practice, the supply of renewable fuel available to refiners, blenders, and importers will be dictated to a large extent by the production capacity of the producers who make renewable fuel. But that does not mean that "supply" includes *only* production capacity. On the contrary, our interpretation of supply allows EPA to consider the amount of renewable fuel available through import, for example. In addition, as Americans for Clean Energy explains, the correct interpretation of "supply" leaves EPA room to consider "non-production factors" – such as a natural disaster – that would affect "a biofuel-fuel producer's ability to deliver its product" to

refiners, blenders, and importers. Americans for Clean Energy Reply 9; *see also* Tr. of Oral Arg. at 5-6. The correct reading of "supply," therefore, does not conflate "supply" with "production."

*Third*, EPA contends that its interpretation better aligns with the "overall policy goals" of the Renewable Fuel Program. Final Rule, 80 Fed. Reg. at 77,436. EPA argues that reading "inadequate domestic supply" to refer only to the available supply of biofuel – without consideration of whether that fuel can be consumed – could "impose large compliance costs on obligated parties with no corresponding increase in the use of renewable fuels, contrary to the purposes of the Act." EPA Br. 52. According to EPA, its interpretation of "inadequate domestic supply" is therefore necessary to avoid causing harmful effects in the renewable fuel market such as "a significant increase in renewable fuel and RIN prices," "RIN deficits," or "non-compliance" by obligated parties. Final Rule, 80 Fed. Reg. at 77,453.

To the extent that application of the statutory volume requirements may lead to negative economic effects, we note that such effects could be addressed through other provisions of the statute. In particular, Congress authorized EPA to reduce the statutory renewable fuel volume requirements upon a determination that implementation of those requirements "would severely harm the economy or environment of a State, a region, or the United States." 42 U.S.C. § 7545(*o*)(7)(A)(i). EPA has not explained why Congress would have established the severe-harm waiver standard "only to allow waiver under the inadequate-supply" provision based on "lesser degrees" of economic harm. Americans for Clean Energy Reply 6. The statute provides other protections against economic harm, too. In the years following 2016, if EPA concludes that the statutory volume requirements for a category of renewable fuel need to

be reduced by more than 20 percent for two consecutive years or by 50 percent in any one year, the statute allows EPA to reset the volume requirements. *See* 42 U.S.C. § 7545(*o*)(7)(F). The statute also provides a safe harbor for individual obligated parties struggling to comply with a year's requirements. The statute mandates that EPA allow those parties to carry a renewable fuel deficit forward into the next compliance year, so long as certain conditions are satisfied. *See id.* § 7545(*o*)(5)(D); 40 C.F.R. § 80.1427(b). In light of those provisions, we are not convinced that EPA's strained interpretation of "inadequate domestic supply" is necessary to avoid the parade of horribles that EPA identifies.

Taking a step back, moreover, we reject EPA's purposive argument on its own terms. That is because EPA's proposed interpretation of the "inadequate domestic supply" waiver provision – in which the demand for renewable fuel largely dictates the volume requirements – turns the Renewable Fuel Program's "market forcing" provisions on their head. Final Rule, 80 Fed. Reg. at 77,423. To be sure, EPA and obligated parties have raised serious concerns that the Renewable Fuel Program is not actually functioning as intended and that, as a result, the statute's requirements will only become more and more impractical to meet. But the fact that EPA thinks a statute would work better if tweaked does not give EPA the right to amend the statute. *Cf. Utility Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2445, slip op. at 21 (2014) ("An agency has no power to 'tailor' legislation to bureaucratic policy goals by rewriting unambiguous statutory terms. Agencies exercise discretion only in the interstices created by statutory silence or ambiguity; they must always give effect to the unambiguously expressed intent of Congress.") (internal quotation marks omitted).

Some – including the Obligated Party Petitioners – say that the statute sets up a crazy regime that requires production of a product that few people want and that therefore will never be consumed. "Even if we were persuaded" by those "policy arguments, those arguments could not overcome the statute's plain language, which is our primary guide to Congress' preferred policy." *Sandoz Inc. v. Amgen Inc.*, 137 S. Ct. 1664, 1678, slip op. at 18 (2017) (internal quotation marks omitted). If the regime is indeed flawed, it is up to Congress and the President to "reenter the field" and fix it. *Henson*, 137 S. Ct. at 1725, slip op. at 10; *see* U.S. CONST. art. I, § 7, cl. 2.

In conclusion, we hold that the statute forecloses EPA's interpretation of the "inadequate domestic supply" waiver provision. We therefore vacate EPA's decision to reduce the total renewable fuel volume requirements for 2016 through use of the "inadequate domestic supply" waiver provision and remand the Final Rule to the agency for further consideration in light of our decision.[2]

B

We now turn to Americans for Clean Energy's argument that EPA was required to consider carryover RINs as a supply source of renewable fuel for purposes of exercising its "inadequate domestic supply" waiver authority. EPA's failure to consider carryover RINs as a source of supply, according to

---

[2] Having reached that conclusion, we need not consider Americans for Clean Energy's alternative arbitrary and capricious challenge to the 2016 total renewable fuel requirement. That challenge was based on EPA's allegedly incorrect calculation of the demand for E85 fuel. Because we conclude that EPA does not have statutory authority to consider demand under the "inadequate domestic supply" waiver provision, the issue of how EPA calculated demand is a moot point.

Americans for Clean Energy, led EPA to set the total renewable fuel volume requirements at too low a level. We reject that argument.

To review: The Renewable Fuel Program requires refiners and importers of gasoline and diesel fuel to satisfy an annual "renewable fuel obligation" issued by EPA. 42 U.S.C. § 7545(*o*)(3)(B)(ii). In the course of setting the annual renewable fuel obligation, EPA must establish the volume requirements for each category of renewable fuel. Those volume requirements represent the total volumes of renewable fuel that must be sold or introduced into United States commerce in a given year. *See Monroe Energy*, 750 F.3d at 912. Although the statute sets forth annual volume requirements for certain years, EPA may reduce those statutory volume requirements in specified circumstances. As just discussed, one component of the statute's general waiver provision allows EPA to reduce the statutory volume requirements when it concludes that there is an "inadequate domestic supply" of renewable fuel. 42 U.S.C. § 7545(*o*)(7)(A)(ii).

Once EPA issues the annual renewable fuel obligations, the obligated parties must satisfy those obligations. To facilitate the compliance process, Congress directed EPA to establish a credit program through which obligated parties may satisfy their renewable fuel obligations by accumulating renewable fuel credits. *Id.* § 7545(*o*)(5). Of importance here, Congress specified that any credits generated for use in the credit trading program "shall be valid to show compliance for the 12 months as of the date of generation." *Id.* § 7545(*o*)(5)(C).

Under the credit program established by EPA, obligated parties comply with their renewable fuel obligations by

acquiring permits known as RINs. Each set of RINs corresponds to a batch of renewable fuel that is produced or imported for use in the United States. *Monroe Energy*, 750 F.3d at 913. To fulfill their statutory requirements, obligated parties accumulate the number of RINs needed to comply with their annual renewable fuel obligations and then retire the RINs in an annual compliance demonstration with EPA. 40 C.F.R. § 80.1427(a). If an obligated party has more RINs than it needs to meet its renewable fuel obligation, the obligated party may sell or trade the extra RINs or instead choose to "bank" the RINs for use in the next compliance year. *Monroe Energy*, 750 F.3d at 913; *see also* 42 U.S.C. § 7545(*o*)(5)(B); 40 C.F.R. §§ 80.1425-29. The industry refers to those saved RINs as "carryover" RINs.

The key question for present purposes is this: When evaluating the available "supply" of renewable fuel for purposes of the "inadequate domestic supply" waiver provision, *must* EPA consider carryover RINs as a supply source of renewable fuel? Americans for Clean Energy argues yes. EPA says no. We agree with EPA that the statute is better read not to require EPA to consider carryover RINs.

We look first to the text of the statute. The Renewable Fuel Program allows EPA to reduce the total renewable fuel volume requirement upon a finding that there is an "inadequate domestic supply" of renewable fuel. 42 U.S.C. § 7545(*o*)(7)(A)(ii). In a separate provision, Congress required EPA to create a "credit program." *Id.* § 7545(*o*)(5) (capitalization altered). Congress contemplated that an obligated party would be allowed to carry over credits from one year into the next: One of the credit program's provisions states that credits generated in the credit program "shall be valid to show compliance for the 12 months as of the date of generation." *Id.* § 7545(*o*)(5)(C). But nothing in the text of

either provision indicates that the "supply" of renewable fuel available in a year must include any available "carryover" credits from the prior year. *See* Final Rule, 80 Fed. Reg. at 77,484 (statute gives "no guidance in the text" regarding "whether or not carryover RINs should be deemed part of the 'supply' referenced" in the general waiver provision).

Americans for Clean Energy counters that a different provision of the statute – EPA's statutory duty to "ensure[]" that the mandated volume requirements are met – requires EPA to consider carryover RINs as a supply source of renewable fuel. 42 U.S.C. § 7545(*o*)(3)(B)(i). It argues that considering carryover RINs as a source of supply in a given year will lead EPA to make a lesser reduction to the statutory volume requirement for total renewable fuel. Congress, however, did not "pursue[] its purposes" of increased renewable fuel generation "at all costs." *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304, 2309, slip op. at 4 (2013) (quoting *Rodriguez v. United States*, 480 U.S. 522, 525-26 (1987) (per curiam)). It included waiver provisions that allow EPA to lessen the Renewable Fuel Program's requirements in specified circumstances, including when EPA concludes that there is an "inadequate domestic supply" of renewable fuel to meet those requirements. It is therefore the text of the "inadequate domestic supply" waiver provision that controls our analysis here. And that text does not reference carryover RINs as a source of supply of renewable fuel.

EPA's proposed interpretation reads "inadequate domestic supply" of renewable fuel to refer only to the "actual renewable fuel" available in a given year and not to carryover RIN credits representing renewable fuel generated the prior year. Final Rule, 80 Fed. Reg. at 77,484. Put differently, EPA's interpretation reads "supply" of renewable fuel to mean just that – "supply of renewable fuel" – rather than "supply of

renewable fuel *and supply of carryover credits*." EPA's interpretation is consistent with the statutory text, not contrary to it.

EPA's interpretation makes eminent sense, moreover, when considered in light of the purposes of the Renewable Fuel Program statute. In promulgating its interpretation, EPA explained the critical importance of carryover RINs to the functioning of the renewable fuel market and to the ability of obligated parties to comply with their obligations. *Id.* at 77,483-84. EPA pointed out that the "bank of carryover RINs" at the time of the Final Rule's issuance was "substantially less, both in absolute numbers and as a percentage of the applicable standards, than was the case in prior actions." *Id.* at 77,486. EPA further noted that, were it to consider carryover RINs as a supply source of renewable fuel for purposes of the "inadequate domestic supply" provision, the number of carryover RINs in the market would be reduced to almost zero. *See id.* at 77,484. Without the flexibility and liquidity provided by carryover RINs, EPA reasoned that obligated parties facing unexpected shortfalls or increased demand for transportation fuel may be left with no way to comply with the statute. *Id.* at 77,483. That situation, in turn, could "lead to the need for a new waiver of the standards" and thereby undermine "the market certainty so critical to the long term success" of the Renewable Fuel Program. *Id.* According to EPA, those concerns counseled in favor of interpreting the phrase "inadequate domestic supply" to refer only to the actual volumes of renewable fuel available in the relevant compliance year. *Id.* at 77,484-85.[3]

[3] Americans for Clean Energy sprinkles a few arbitrary and capricious challenges into its argument regarding EPA's interpretation. Even assuming that those arguments are not foreclosed by the text of the statute, they still lack merit. *First*, Americans for Clean Energy argues that EPA "did not explain why"

EPA's interpretation also reasonably balances the need to drive growth in the renewable fuel industry with the need to ensure that obligated parties have sufficient flexibility to comply with the statute. EPA stresses that, under its interpretation, EPA may still consider carryover RINs when determining whether it *should* exercise its "inadequate domestic supply" waiver authority to reduce statutory volume requirements. *Id.* According to EPA, the presence of a large amount of carryover RINs in the market will make EPA less likely to reduce the statutory volume requirements. *Id.* at 77,485; *cf. Monroe Energy*, 750 F.3d at 917 (EPA may consider "availability of carryover RINs" when determining whether to exercise waiver authority to reduce total renewable

---

the carryover RIN bank "must have at least 1.74 billion RINs" or explain why EPA could not "safely" reduce the bank to a lesser amount. Americans for Clean Energy Br. 31. EPA explained, however, that "the result" of interpreting "supply" in the manner proposed by Americans for Clean Energy "would be a complete drawdown in the collective bank of carryover RINs in a relatively short time period." Final Rule, 80 Fed. Reg. at 77,484. That is, Americans for Clean Energy's interpretation of "supply" as including carryover RINs would leave EPA no choice but to reduce the carryover RIN bank to almost zero. EPA concluded that such a result threatened the interests of the Renewable Fuel Program. *Second*, contrary to Americans for Clean Energy's contentions, EPA adequately explained why its interpretation will not discourage obligated parties from investing in new generation of renewable fuel. EPA noted, for example, that the statute's increasing volume requirements have made it "increasingly difficult" for obligated parties to "over-comply and create carryover RINs" – meaning that obligated parties will need to invest in new renewable fuel sources to generate sufficient RINs for compliance. *Id.* at 77,485. EPA also cited evidence from 2013 showing that parties generated new RINs, rather than relying exclusively on carryover RINs, to meet their compliance burdens. *Id.* at 77,486.

fuel volume requirement). EPA also pointed out that its regulations specify "that obligated parties may only satisfy 20 percent" of their annual renewable fuel obligations with carryover RINs. Final Rule, 80 Fed. Reg. at 77,485. EPA reasonably concluded that those considerations will mitigate the possibility that obligated parties will comply with their obligations through large amounts of carryover RINs rather than through investment in increased renewable fuel generation. *See id.* at 77,484-86.[4]

Given all of the above, we uphold EPA's interpretation of the "inadequate domestic supply" waiver provision. EPA need not consider carryover RINs as a supply source of renewable fuel for purposes of determining the supply of renewable fuel available in a given year.[5]

III

In this section, we address two challenges arising from EPA's lateness in issuing the Final Rule. First, EPA cited its own lateness – and the need to avoid imposing retroactive burdens on obligated parties – as a reason to set the 2014 and 2015 volume requirements based on the volume of renewable

---

[4] Because EPA sufficiently explained the practical and policy-based reasons for its decision to maintain the carryover RIN bank, we also reject National Biodiesel Board's argument that EPA's carryover RIN analysis was irrational. *See* National Biodiesel Board Br. 18-19.

[5] Because we agree with EPA that its reading of this provision is the better reading, we need not consider whether it is *unambiguously* the better reading for *Chevron* purposes such that EPA could not alter its interpretation in the future. *Cf. Coventry Health Care of Missouri, Inc. v. Nevils*, 137 S. Ct. 1190, 1198 n.3, slip op. at 9 n.3 (2017); *Action Alliance of Senior Citizens v. Sebelius*, 607 F.3d 860, 863 n.2 (D.C. Cir. 2010).

fuel actually supplied in those years. National Biodiesel Board and Americans for Clean Energy argue that this was error. Second, EPA missed the relevant statutory deadlines to issue biomass-based diesel volume requirements for the years 2014 through 2017. The Obligated Party Petitioners argue that this was error. We reject both of those challenges.

A

As explained above, the Renewable Fuel Program requires obligated parties – namely, refiners and importers of gasoline or diesel fuel – to meet an annual renewable fuel obligation for four categories of renewable fuel. Obligated parties calculate their annual compliance obligations using percentage standards set by EPA. The percentage standards, in turn, are based on volume requirements, also set by EPA. The volume requirements represent the total volume of renewable fuel that must be introduced into the Nation's transportation fuel supply in a given year.

In the Renewable Fuel Program, Congress provided statutory tables setting annual volume requirements for four categories of renewable fuel. The statutory tables for three categories – cellulosic biofuel, advanced biofuel, and total renewable fuel – provide volume requirements through the year 2022. *See* 42 U.S.C. § 7545(*o*)(2)(B)(i)(I)-(III). The statutory table for biomass-based diesel, in contrast, provides volume requirements only through the year 2012. *Id.* § 7545(*o*)(2)(B)(i)(IV). For subsequent years, the statute sets a baseline volume requirement at one billion gallons. *See id.* § 7545(*o*)(2)(B)(v). The statute vests EPA with the responsibility to promulgate an annual volume requirement over and above that baseline. In making that determination, EPA must consider a number of statutory factors. *See id.* § 7545(*o*)(2)(B)(ii).

EPA must meet two different statutory deadlines when promulgating volume requirements and percentage standards. First, EPA must promulgate all renewable fuel percentage standards for a given year by November 30 of the preceding year. *Id.* § 7545(*o*)(3)(B)(i). Second, EPA must promulgate the volume requirements for those years not covered by the statutory tables "no later than 14 months before the first year" for which such volume requirements will apply. *Id.* § 7545(*o*)(2)(B)(ii).

As it relates to the challenges in this section, EPA therefore faced the following deadlines for the volume requirements and percentage standards set in the Final Rule: (i) EPA was required to promulgate the percentage standards (and associated volume requirements) for cellulosic biofuel, advanced biofuel, and total renewable fuel for the year 2014 by November 30, 2013, and for the year 2015 by November 30, 2014; and (ii) EPA was required to promulgate the volume requirements for biomass-based diesel by October 2012 for year 2014; October 2013 for year 2015; and so on.

EPA issued the Final Rule in December 2015. Therefore, as relevant here, EPA failed to meet the statutory deadlines for all of the 2014 and 2015 percentage standards and also missed the statutory deadlines for the biomass-based diesel volume requirements for the years 2014 through 2017. *See* Final Rule, 80 Fed. Reg. at 77,430.

Despite its delay, EPA stated that it was issuing percentage standards for the years 2014 and 2015 and biomass-based diesel volume requirements for the years 2014 through 2017. EPA stated that it had authority to issue the late standards and requirements under this Court's precedents in *National Petrochemical & Refiners Association v. EPA*, 630 F.3d 145

(D.C. Cir. 2010), and *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014). According to EPA, those decisions authorize EPA to issue late renewable fuel standards with retroactive effect so long as EPA reasonably mitigates any burdens that its lateness imposes on obligated parties. *See* Final Rule, 80 Fed. Reg. at 77,430.

In the Final Rule, EPA explained the steps it had taken to mitigate any burdens imposed by the late issuance of the Final Rule. *See id.* at 77,430-31, 77,491-92. In particular, EPA set the volume requirements (and associated percentage standards) for all fuel types for the years 2014 and 2015 based on the volumes of renewable fuel that were actually introduced and available for compliance during those years. *See id.* at 77,440.[6] EPA asserted that its approach meant that there would be "an adequate quantity of RINs available to satisfy" the 2014 and 2015 requirements and thus would prevent the Final Rule from imposing an "unreasonable burden" on obligated parties. *Id.* at 77,430, 77,431; *see also id.* at 77,446-47. With respect to the late biomass-based diesel requirements, EPA concluded that obligated parties had adequate notice of their obligations and would have sufficient time to acquire the necessary RINs to comply with their obligations. *See id.* at 77,491; *see also* EPA Br. 103.

Two sets of parties now challenge EPA's analysis. *First*, National Biodiesel Board and Americans for Clean Energy

---

[6] To determine the actual volumes of renewable fuel that were introduced and available for compliance during 2014 and the relevant months of 2015, EPA looked to the "net" number of renewable fuel RINs generated during those years. The "net" number of renewable fuel RINs equals the total number of renewable fuel RINs generated "minus RINs retired for non-compliance reasons such as exports of renewable fuel or spills." Final Rule, 80 Fed. Reg. at 77,440; *see also id.* at 77,447-48.

argue that EPA erred by citing its delay as a reason to set the 2014 and 2015 volume requirements lower than the statutory volume requirements. *Second*, the Obligated Party Petitioners argue that EPA lacked authority to issue the late biomass-based diesel volume requirements for the years 2014 through 2017. We now address, and ultimately reject, each of those arguments.

B

EPA relied on its lateness in issuing the 2014 and 2015 renewable fuel requirements as a reason to set those requirements based on the actual volumes of renewable fuel that were introduced and available for compliance during those years. National Biodiesel Board and Americans for Clean Energy say that was impermissible. Based on our precedents, we reject their challenge.

In *National Petrochemical & Refiners Association v. EPA*, 630 F.3d 145 (D.C. Cir. 2010), this Court held that EPA has statutory authority to issue late renewable fuel requirements, even when they have retroactive effects. *See id.* at 154-58. EPA's authority to issue late renewable fuel requirements is not unlimited, however. Rather, we specified in *National Petrochemical* that EPA must exercise its authority reasonably by considering the "benefits and the burdens attendant to its approach" of issuing late renewable fuel requirements. *Id.* at 166. Applying that standard, we concluded that EPA's issuance of a late volume requirement with retroactive effects was reasonable. That was so because EPA considered, among other things, whether obligated parties had adequate lead time and access to a sufficient number of RINs to comply with the delayed requirement. *Id.* at 165.

We followed the same approach a few years later in *Monroe Energy, LLC v. EPA*, 750 F.3d 909 (D.C. Cir. 2014). In that case, we concluded that EPA's decision to issue late renewable fuel standards was reasonable because EPA "considered various ways to minimize the hardship caused to obligated parties" by its delay and chose to extend the compliance deadline. *Id.* at 920.

*National Petrochemical* and *Monroe Energy* together establish that EPA may promulgate late renewable fuel requirements – and even apply those standards retroactively – so long as EPA reasonably considers and mitigates any hardship caused to obligated parties by reason of the lateness.

According to National Biodiesel Board and Americans for Clean Energy, EPA erred by treating its lateness "as license" to reduce the 2014 and 2015 statutory volume requirements to reflect the actual volumes of renewable fuel that were introduced and available for compliance during those years. Americans for Clean Energy Br. 25; *see also* National Biodiesel Board Br. 16. That argument, however, overlooks the fact that 2014 and most of 2015 had already passed by the time EPA issued the Final Rule. Although EPA determined that it was duty-bound to issue volume requirements and percentage standards for those years – even though they were late – EPA also recognized its duty to consider and mitigate any hardships caused to obligated parties by reason of its lateness.

EPA took a number of steps to minimize the harm and retroactive effects caused by its late issuance of the 2014 and 2015 standards. The most important of those steps was EPA's choice to set the volume requirements for the years 2014 and 2015 based on the actual volumes of renewable fuel that were introduced and available for compliance. By setting the 2014

and 2015 standards based on actual renewable fuel volumes – as measured by the number of RINs that were both generated and available for compliance during those years – EPA ensured that there would be a sufficient supply of RINs available to allow obligated parties to satisfy the requirements. Final Rule, 80 Fed. Reg. at 77,430; *see also id.* at 77,439-40. EPA explained that setting the standards based on the statutory volume requirements would be an "unreasonable approach" because it would "require either noncompliance" on the part of obligated parties or create dysfunction in the renewable fuel market. *See id.* at 77,439.

Therefore, contrary to the contention advanced by National Biodiesel Board and Americans for Clean Energy, this is not a simple case of EPA using its delay as an excuse to shirk its statutory duties. EPA's decision regarding the 2014 and 2015 volume requirements instead reflects the fact that EPA was bound by our precedents (not to mention basic principles of due process) to mitigate the hardships to obligated parties caused by late promulgation and retroactive application of the 2014 and 2015 standards. In a perfect world, agencies such as EPA would never miss their deadlines. But once they have, our precedents in this area require that EPA reasonably balance its statutory duties with the rights of the entities it regulates.[7]

---

[7] National Biodiesel Board counters that, even if EPA were authorized to set the 2014 and 2015 volume requirements based on actual fuel volumes generated during those years, EPA improperly focused on the volumes of fuel that were "available for compliance." National Biodiesel Board Br. 18. National Biodiesel Board argues that EPA should have set the volume requirements based on "gross" RIN generation – that is, the total number of renewable fuel RINs generated without subtracting any RINs that were exported or put to non-qualifying uses. *Id.* We do not agree. As EPA explained, its approach to setting the late 2014 and 2015 volume requirements

In conclusion, EPA's decision to set the late 2014 and 2015 volume requirements based on the actual volumes of fuel introduced and available for compliance during those years was reasonable in light of EPA's duty to mitigate any effects of its delay on obligated parties.

C

We next consider whether EPA permissibly issued the biomass-based diesel volume requirements for the years 2014 through 2017. Answering that question requires us to determine (i) whether EPA had statutory authority to issue late biomass-based diesel volume requirements and (ii) if so, whether EPA exercised that authority reasonably. Contrary to the arguments of the Obligated Party Petitioners, the answer to both of those questions is yes.

1

In the December 2015 Final Rule, EPA promulgated the biomass-based diesel volume requirements for the years 2014 through 2017. The statutory volume tables do not contain volume requirements for biomass-based diesel after the year 2012. Rather, the biomass-based diesel table sets a minimum

---

ensures that obligated parties will be able to meet those requirements by buying and selling RINs. That method of compliance would not be available under National Biodiesel Board's proposed approach, which would set the volume requirements at levels higher than the number of RINs available in the market. National Biodiesel Board's approach of using gross RIN generation to set the 2014 and 2015 volume requirements therefore suffers from the same problem as using the statutory volume requirements – it would require noncompliance or create dysfunction in the renewable fuel market. *See* Final Rule, 80 Fed. Reg. at 77,439-40, 77,445.

volume requirement at one billion gallons. *See* 42 U.S.C. § 7545(*o*)(2)(B)(v). For each year following 2012, EPA must determine the biomass-based diesel volume requirement in the first instance after considering a number of statutory factors. *See id.* § 7545(*o*)(2)(B)(ii). EPA promulgated the following biomass-based diesel requirements in the Final Rule: 1.63 billion gallons (year 2014); 1.73 billion gallons (year 2015); 1.90 billion gallons (year 2016); and 2.0 billion gallons (year 2017). *See* Final Rule, 80 Fed. Reg. at 77,422 tbl.I-1.

By statute, EPA must promulgate volume requirements for years not covered by the statutory volume tables "no later than 14 months before the first year" for which the volume requirement will apply. 42 U.S.C. § 7545(*o*)(2)(B)(ii). EPA did not promulgate the Final Rule until December 2015. It therefore missed the statutory deadlines for promulgating the biomass-based diesel volume requirements.

Notwithstanding those missed deadlines, EPA argues that it had authority to promulgate the biomass-based diesel requirements under this Court's decisions in *National Petrochemical* and *Monroe Energy*. We agree with EPA.

As discussed in the previous section, this Court held in *National Petrochemical* and again in *Monroe Energy* that Congress authorized EPA to issue late renewable fuel volume requirements under the Renewable Fuel Program. In reaching that outcome, we looked first to the text of the statute. We noted that Congress "did not state" in the statutory text "what would happen if EPA failed to meet the statutory deadline for promulgating" renewable fuel regulations. *National Petrochemical*, 630 F.3d at 154. We explained that "where there are less drastic remedies available for an agency's failure to meet a statutory deadline, courts should not assume

Congress intended for the agency to lose its power to act." *Id.* (citing *Brock v. Pierce County*, 476 U.S. 253, 260 (1986)).

Applying that principle, we concluded that it was "highly unlikely" that Congress intended EPA's delay to prevent EPA from fulfilling its statutory mandate to "promulgate regulations to ensure" that transportation fuel contains "at least the applicable volume of renewable fuel, advanced biofuel, cellulosic biofuel, and biomass-based diesel, determined in accordance with subparagraph (B)." *Id.* at 153, 156 (emphasis omitted) (quoting 42 U.S.C. § 7545(*o*)(2)(A)(i)). Declining to endorse such a "drastic" and "incongruous result," we instead held that EPA may issue late volume requirements so long as it acts reasonably in doing so. *Id.* at 157 (quoting *Brock*, 476 U.S. at 258); *see also Monroe Energy*, 750 F.3d at 920. Here we confront that "same issue" – EPA's authority to issue late volume requirements under the Renewable Fuel Program. *LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996) (en banc) (emphasis omitted). Therefore, we are bound by stare decisis to reach the "same result" – EPA may issue delayed volume requirements so long as it acts reasonably in doing so. *Id.* (emphasis omitted).

The Obligated Party Petitioners counter that *National Petrochemical* and *Monroe Energy* do not control our analysis of EPA's authority to issue the delayed biomass-based diesel volume requirements. They say that the industry parties in those cases were on notice of their potential statutory obligations before EPA issued the delayed volume requirements. The Obligated Party Petitioners claim that the notice provided by the statutory volume tables in *National Petrochemical* and *Monroe Energy* was a pre-condition to the Court's conclusion that EPA had statutory authority to issue the delayed volume requirements at issue in those cases. Because such notice is lacking in this case, the Obligated Party

Petitioners contend that EPA had no authority to set the biomass-based diesel requirements at levels above the statutory floor of one billion gallons or, in the alternative, above the 2013 biomass-based diesel volume requirement of 1.28 billion gallons.

That argument is not persuasive. The general rule that *National Petrochemical* and *Monroe Energy* establish – that EPA has authority to issue late renewable fuel volume requirements – was based on the Court's reading of the statute and on congressional intent. Specifically, the Court pointed to: (i) Congress's failure to specify the consequences of EPA's failure to meet a statutory deadline; (ii) the principle that "where there are less drastic remedies available for an agency's failure to meet a statutory deadline, courts should not assume Congress intended for the agency to lose its power to act"; (iii) EPA's "statutory mandate" to "ensure" that the annual volume requirements are met; and (iv) the notion that it would be "drastic" and "incongruous" to preclude EPA from fulfilling that "statutory mandate" based on its delay. *National Petrochemical*, 630 F.3d at 154, 157; *Monroe Energy*, 750 F.3d at 920. Each of those rationales applies when it comes to EPA's duty to promulgate biomass-based diesel volume requirements.

Applying the analysis set forth in *National Petrochemical* and *Monroe Energy*, we therefore conclude that EPA had statutory authority to issue the late biomass-based diesel volume requirements for the years 2014 through 2017.

2

Having determined that EPA had statutory authority to issue the delayed biomass-based diesel volume requirements, we must also examine whether EPA exercised its authority "in

a reasonable manner." *Monroe Energy*, 750 F.3d at 920. Answering that question requires us to decide whether EPA adequately "considered various ways to minimize the hardship caused to obligated parties" by virtue of EPA's delay. *Id.*; *see also National Petrochemical*, 630 F.3d at 166 (EPA must consider and balance any "burdens attendant to its approach" of issuing delayed renewable fuel requirements). We conclude that EPA passed that test when promulgating the biomass-based diesel volume requirements.

EPA's approach – and therefore our analysis of the question – differs with respect to the 2016 and 2017 volume requirements, which applied only prospectively, and the 2014 and 2015 requirements, which did have retroactive effects. We address each set of requirements in turn.

*First*, we consider EPA's decision to promulgate late biomass-based diesel requirements for the years 2016 and 2017. Because those requirements were issued before the start of 2016, they did not impose any retroactive compliance burdens on obligated parties. Although conceding that point, the Obligated Party Petitioners nonetheless argue that EPA's delay burdened obligated parties by leaving them without sufficient notice to plan for and meet the 2016 and 2017 volume requirements. Given that hardship, the Obligated Party Petitioners contend that EPA must set the 2016 and 2017 volume requirements at the one billion gallon statutory minimum or, alternatively, the 1.28 billion gallon volume requirement applicable to 2013.

We do not agree. EPA's June 2015 proposed rule would have set the 2016 and 2017 biomass-based diesel volume requirements at 1.8 billion and 1.9 billion gallons, respectively. *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017,

80 Fed. Reg. 33,100, 33,105 tbl.I.A-3 & n.13 (June 10, 2015). Therefore, contrary to the Obligated Party Petitioners' contentions, obligated parties had many months' notice of EPA's intent to issue volume requirements much higher than either the statute's one billion gallon minimum volume requirement or the 1.28 billion gallon volume requirement applicable in 2013. *See* Final Rule, 80 Fed. Reg. at 77,491. True, the proposed volume requirements were each 100 million gallons less than the final 2016 and 2017 biomass-based diesel volume requirements. But as EPA explained, even the late Final Rule left obligated parties with 15 months to acquire the necessary RINs to comply with the 2016 requirements. *See id.* In 2017, the delay had even less effect: The Final Rule was issued more than 13 months before the 2017 compliance year even began. Given the industry's notice of EPA's intent to issue volume requirements greater than the statutory minimum and the significant amount of time obligated parties had to comply with the 2016 and 2017 requirements, the Obligated Party Petitioners have failed to demonstrate how EPA's delay meaningfully affected their ability to satisfy the biomass-based diesel obligations. We therefore conclude that EPA reasonably exercised its authority when issuing the delayed biomass-based diesel volume requirements for 2016 and 2017.

*Second*, we consider EPA's decision to promulgate late biomass-based diesel requirements for the years 2014 and 2015. Those requirements, unlike the 2016 and 2017 requirements, do have retroactive effects. But in the Final Rule, EPA "acknowledged" that fact and reasonably considered "ways to minimize the hardship" associated with the delayed and retroactive standards. *Monroe Energy*, 750 F.3d at 920. Most importantly for present purposes, EPA avoided placing an unreasonable burden on obligated parties by setting the 2014 and 2015 requirements based on the actual volumes of biomass-based diesel available in those years. EPA

noted that setting the volume requirements at higher volumes than those actually available would be an "unreasonable approach" in part because it might require "noncompliance" on the part of obligated parties. Final Rule, 80 Fed. Reg. at 77,439. By contrast, EPA's choice to use actual fuel volumes to set the 2014 and 2015 volume requirements ensured that there would "be an adequate quantity of RINs available to satisfy those portions of the final requirements." *Id.* at 77,430; *see also id.* at 77,446-47. Indeed, given that obligated parties had been "acquiring RINs since the beginning of 2014 in anticipation of the final volume requirements and standards," EPA noted that some obligated parties likely were already in compliance with the 2014 and 2015 biomass-based diesel standards. *Id.* at 77,430.

The Obligated Party Petitioners counter that the fact that some obligated parties may find themselves already in compliance with the 2014 and 2015 biomass-based diesel standards does not mean that all obligated parties would be in compliance. Applying the requirements to the parties who had not acquired enough RINs to meet the 2014 and 2015 requirements, according to the Obligated Party Petitioners, results in impermissibly retroactive compliance burdens.

In the Final Rule, EPA gave a number of responses to that objection, however. *First*, EPA stated that parties who need to "adjust the types" of RINs they own will be able to do so. *Id.* at 77,491; *see also id.* at 77,446-47. Those parties "will be able to sell" their non-biomass-based diesel advanced biofuel RINs "for a nearly identical price" as the biomass-based diesel RINs that they will need to purchase. *Id.* at 77,491. *Second*, to allow obligated parties "additional time" to acquire the biomass-based diesel RINs needed for compliance, EPA provided "very extensive extensions of the normal compliance demonstration deadlines." *Id.* at 77,447, 77,491; *cf. Monroe Energy*, 750 F.3d

at 920-21. *Third*, to the extent that any obligated party could not acquire a sufficient number of biomass-based diesel RINs to comply with the requirements, EPA noted that the obligated party had "two additional compliance flexibility options." Final Rule, 80 Fed. Reg. at 77,491. Specifically, EPA pointed out that those parties could (i) utilize carryover biomass-based diesel RINs to meet their compliance obligation or (ii) take advantage of the "carry-forward deficit provision" of the Renewable Fuel Program "to carry forward the deficit for one year on the condition that it be met the following year." *Id.* at 77,492; *see also id.* at 77,447, 77,491.

EPA's analysis in the Final Rule reveals that EPA "considered various ways to minimize the hardship caused to obligated parties" by the delayed issuance of the 2014 and 2015 biomass-based diesel volume requirements. *Monroe Energy*, 750 F.3d at 920. Under our precedents, the Final Rule reflects EPA's reasonable use of its authority to issue delayed Renewable Fuel Program volume requirements.

In short, based on our precedents, we conclude that EPA had statutory authority to issue the late biomass-based diesel standards and exercised that authority reasonably.

IV

We now address the Obligated Party Petitioners' challenge to EPA's projection of cellulosic biofuel production for the year 2016. The Obligated Party Petitioners assert that EPA's projection methodology is arbitrary and capricious in a variety of ways. We reject those arguments.

A

Before examining the merits of the Obligated Party Petitioners' challenge, it is helpful to have a bit of background on: the cellulosic biofuel market; the statutory provisions and precedents governing EPA's duties when making cellulosic biofuel projections; and the projection methodology that EPA employed in the Final Rule.

1

In 2007, Congress amended the Renewable Fuel Program to include volume requirements for cellulosic biofuel. Cellulosic biofuel is a kind of advanced biofuel. It is derived from sources of cellulose, such as switchgrass and agricultural wastes, as well as from biogas from landfills, municipal wastewater treatment facilities, agricultural digesters, and separated municipal solid waste digesters. Cellulosic biofuel is the "greenest" form of renewable fuel mandated by the Renewable Fuel Program: It must have greenhouse gas emissions that "are at least 60 percent less than" the greenhouse gas emissions of conventional gasoline or diesel fuel, as determined by EPA. 42 U.S.C. § 7545(*o*)(1)(E); *see also id.* § 7545(*o*)(1)(C); 40 C.F.R. § 80.1426 tbl.1. At the time the cellulosic biofuel requirements were introduced by Congress in 2007, "there was no commercial-scale production" of cellulosic biofuel "at all." *American Petroleum Institute v. EPA*, 706 F.3d 474, 476 (D.C. Cir. 2013). In light of the "technological challenges" associated with the generation of cellulosic biofuel, the statute directs EPA to follow distinct procedures when setting cellulosic biofuel standards. *Id.*

When setting the annual percentage standards for cellulosic biofuel, EPA must first calculate a "projected volume of cellulosic biofuel production" for the relevant

calendar year. 42 U.S.C. § 7545(*o*)(7)(D)(i). Those projections must be "based on" the Energy Information Administration's estimate of the volume of "cellulosic biofuel projected to be sold or introduced into commerce in the United States." *Id.* § 7545(*o*)(7)(D)(i), (3)(A). If EPA's projected volume of cellulosic biofuel falls short of the statutory volume requirement, then EPA "shall reduce the applicable volume of cellulosic biofuel required . . . to the projected volume available during that calendar year." *Id.* § 7545(*o*)(7)(D)(i).

2

In the Final Rule, EPA projected the amount of cellulosic biofuel likely to be produced in 2016. (EPA did not need to make projections for 2014 and 2015 because EPA set volume requirements for those years based on the actual volumes of renewable fuel that were introduced during those years.) In making projections for 2016, EPA factored in significant changes that had occurred in the development and EPA's regulation of the cellulosic biofuel market in 2014.

Until 2014, there was only one type of biofuel that qualified as "cellulosic biofuel" under the Renewable Fuel Program: liquid cellulosic biofuel, "an advanced biofuel derived from sources of lignocellulose such as switchgrass and agricultural wastes" such as corn stalks. *American Petroleum Institute*, 706 F.3d at 476. As previously discussed, when Congress amended the Renewable Fuel Program to include a cellulosic biofuel requirement, no company had the technological capacity to produce liquid cellulosic biofuel on a commercial scale. Indeed, as of late 2013, there were few companies in the country that had the potential to consistently produce any volumes of cellulosic biofuel.

In 2014, however, EPA promulgated a rule under which certain types of liquefied and compressed natural gas – we will refer to both types as "biogas" for simplicity's sake – could qualify as cellulosic biofuels for purposes of the Renewable Fuel Program's requirements. *See* Regulation of Fuels and Fuel Additives: RFS Pathways II, and Technical Amendments to the RFS Standards and E15 Misfueling Mitigation Requirements, 79 Fed. Reg. 42,128, 42,137 (July 18, 2014); *see also* Final Rule, 80 Fed. Reg. at 77,499. The technology for producing biogas was, and remains, much more widespread than the technology for producing liquid cellulosic biofuel. *See* Final Rule, 80 Fed. Reg. at 77,505-06. Indeed, in the Final Rule, EPA projected that biogas would make up around 90 percent of the cellulosic biofuel market in 2016. *See id.* at 77,501. In addition, the production of liquid cellulosic biofuel increased substantially in 2014 with the opening of new commercial-scale liquid cellulosic biofuel production facilities. For those reasons, the amount of cellulosic biofuel available to meet the Renewable Fuel Program standards has substantially increased since late 2014.

EPA's approach to projecting the 2016 cellulosic biofuel production levels reflects those recent changes to the cellulosic biofuel market. As required by statute, EPA first looked to the Energy Information Administration's 2016 cellulosic biofuel estimates. But for two reasons, EPA concluded that those estimates were incomplete. *First*, although the estimates included projections for liquid cellulosic biofuel, they did not include any projections for biogas. *See id.* at 77,501. That was a problem because, as just noted, biogas would make up the dominant percentage of the cellulosic biofuel market in 2016. *Second*, the Energy Information Administration's estimates did not include data from certain cellulosic biofuel production plants that EPA independently determined to be potential sources of cellulosic biofuels in 2016. *Compare id.* at 77,501

tbl.IV.B.3, *with id.* at 77,501 tbl.IV.C-1. Given those omissions, EPA was largely on its own when projecting the amount of cellulosic biofuel likely to be produced in 2016.

EPA's 2016 projection methodology followed a number of steps, as described below. At the end of those steps, EPA had calculated a total volume projection for each of the two main categories of cellulosic biofuel: liquid cellulosic biofuel and biogas. EPA then added those two volume amounts together to generate a single cellulosic biofuel volume projection for the year 2016.

*First*, EPA determined which renewable fuel production plants had the potential to produce "commercial scale volumes" of cellulosic biofuel in 2016. *Id.* at 77,499; *see also id.* at 77,501 tbl.IV.B.3 (listing projected producers of cellulosic biofuel). EPA considered both domestic and foreign producers of cellulosic biofuel. *See id.* at 77,500; *see also* Cellulosic Biofuel Producer Company Descriptions, Memorandum from Dallas Burkholder to EPA Air and Radiation Docket EPA-HQ-OAR-2015-0111 (Nov. 2015), J.A. 814.

*Second*, EPA divided those producers into four groups: (i) liquid cellulosic biofuel producers that have not achieved consistent commercial production; (ii) liquid cellulosic biofuel producers that have achieved consistent commercial production; (iii) biogas producers that have not achieved consistent commercial production; and (iv) biogas producers that have achieved consistent commercial production. *See* Final Rule, 80 Fed. Reg. at 77,505; *id.* at 77,508 tbl.IV.F-4.

*Third*, EPA calculated a range of likely production from each individual cellulosic biofuel producer. *See id.* at 77,503. EPA set the low end of each producer's range "based on the

volume of RIN-generating cellulosic biofuel the company has produced in the most recent 12 months for which data is available." *Id.* To arrive at the high end of each producer's range, EPA "considered a variety of factors," including "the expected start-up date and ramp-up period" as well as "facility capacity." *Id.* EPA used those factors to calculate a high-end production volume based on an "optimistic ramp-up scenario" of six months. *Id.* EPA then compared its high-end volume estimates to any volume projections provided by the producers or industry associations. If the high-end volume projections were different, EPA used the lesser of the two volume projections. *Id.* at 77,504.

*Fourth*, after EPA had individual ranges for each producer, it then aggregated the ranges of the producers by category. That is, for each of the four categories of producers, EPA generated a single range of likely cellulosic biofuel production. *See id.* at 77,508 tbl.IV.F-1 to tbl.IV.F-4. EPA stated that its approach of generating a range for each category helped minimize any potential skewing effect caused by an over- or under-estimation of a single company's range. *Id.* at 77,505-06.

*Fifth* and finally, EPA chose a specific volume projection from within each aggregated production range. EPA did so through use of what it called a "percentile" method.[8] Under that approach, EPA chose a number from within each production range that reflected the fact that less-proven producers were less likely to produce cellulosic biofuel at the high end of their ranges, while the more proven producers were

---

[8] Although EPA refers to its approach as the "percentile" method, EPA did not utilize "percentiles" as that term is typically understood. We nonetheless retain EPA's terminology for ease of reference.

more likely to do so. *Id.* at 77,506 & tbl.IV.E-5. In particular, EPA chose specific volumes from within each volume range as follows: (i) for liquid cellulosic biofuel producers without consistent commercial production, EPA chose the value that was the one-quarter point between the low end and high end of the range; (ii) for liquid cellulosic biofuel producers with consistent commercial production, EPA chose the value that was the midpoint between the low end and high end of the range; (iii) for biogas producers without consistent commercial production, EPA also chose the value that was the midpoint between the low end and high end of the range; and (iv) for biogas producers with consistent commercial production, EPA chose the value that was the three-quarter point between the low end and high end of the range. *Id.*

An example helps illustrate EPA's approach. Suppose that for all four groups of producers, the aggregated ranges of projected cellulosic biofuel production are zero to 10 million gallons. Under EPA's approach, the final projected volume from each group would be: (i) 2.5 million gallons (25 percent of 10 million) for liquid cellulosic biofuel producers without consistent commercial production; (ii) five million gallons (50 percent of 10 million) for liquid cellulosic biofuel producers with consistent commercial production; (iii) five million gallons (again, 50 percent of 10 million) for biogas producers without consistent commercial production; and (iv) 7.5 million gallons (75 percent of 10 million) for biogas producers with consistent commercial production. Adding those amounts together, EPA's final cellulosic biofuel projection in this example would be 20 million gallons.

Using that methodology, EPA calculated projected volumes for each group of producers for the year 2016: (i) 19 million gallons of liquid cellulosic biofuel from liquid cellulosic biofuel producers that have not achieved consistent

commercial production; (ii) four million gallons of liquid cellulosic biofuel from liquid cellulosic biofuel producers that have achieved consistent commercial production; (iii) 32 million gallons of biogas from biogas producers that have not achieved consistent commercial production; and (iv) 175 million gallons of biogas from biogas producers that have achieved consistent commercial production. *See id.* at 77,508 tbl.IV.F-4. Adding those numbers together, EPA projected a final total cellulosic biofuel volume of 230 million gallons – a figure 4.02 *billion* gallons less than the statutory volume requirement for 2016. *Compare id.*, *with id.* at 77,499 tbl.IV.A-1. The statute was a bit optimistic, to put it generously.

## B

The Obligated Party Petitioners challenge EPA's 2016 projections of both liquid cellulosic biofuel and biogas. They argue that EPA's projection methodology failed to take a "neutral aim at accuracy" as required by this Court's decision in *American Petroleum Institute*, 706 F.3d at 476. They also argue that certain aspects of EPA's decisionmaking were arbitrary and capricious.

We employ the deferential *State Farm* standard of review when reviewing arguments based on allegedly arbitrary or unreasoned agency action. *See Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Under that standard, EPA "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (internal quotation marks omitted). In other words, the "question is not what we would have done, nor whether we agree with the agency action. Rather, the question is whether

the agency action was reasonable and reasonably explained." *Jackson v. Mabus*, 808 F.3d 933, 936 (D.C. Cir. 2015). Applying that standard of review, we reject the Obligated Party Petitioners' challenges.

1

We first address the Obligated Party Petitioners' challenge to EPA's liquid cellulosic biofuel projection for 2016. On that score, the Obligated Party Petitioners' central contention is that EPA's 2016 projection methodology fails to take a "neutral aim at accuracy" as required by *American Petroleum Institute*, 706 F.3d at 476. The Obligated Party Petitioners also raise several arbitrary and capricious challenges to EPA's decisionmaking. None of their arguments has merit.

*First*, the Obligated Party Petitioners advance an overarching argument that EPA's methodology fails to take a "neutral aim at accuracy" as required by this Court's decision in *American Petroleum Institute*. *See id.* We do not agree. In *American Petroleum Institute*, the Court evaluated an EPA cellulosic biofuel projection methodology that erred on the side of overestimation in order to "provide the appropriate economic conditions for the cellulosic biofuel industry to grow." *Id.* at 478. The Court concluded that EPA's projection methodology was improper because it failed to take a "neutral aim at accuracy." *Id.* at 476. Instead, EPA issued projections with a "special tilt" toward promoting cellulosic biofuel growth. *Id.* at 478. Therefore, *American Petroleum Institute*'s requirement that EPA take "neutral aim at accuracy" has a distinct meaning: It prevents EPA from using a projection methodology with a "special tilt" – that is, a methodology that errs on the side of "overestimation" – in order to promote growth in the cellulosic biofuel industry. *Id.* at 476, 478, 479.

Here, by contrast to *American Petroleum Institute*, EPA's methodology does not reflect a "non-neutral purpose" to favor (or disfavor) growth in the cellulosic biofuel industry. *Id.* at 478. Instead, the Obligated Party Petitioners argue that particular components of EPA's methodology, and thus EPA's final projections, are flawed. But those arguments are garden-variety arbitrary and capricious challenges directed at EPA's "technocratic exercise of agency discretion." *Id.* at 477. They do not demonstrate that EPA has violated its duty to take a "neutral aim at accuracy," at least as that duty was articulated by this Court in *American Petroleum Institute*. *Id.* at 476.

*Second*, the Obligated Party Petitioners argue that EPA's decision to use the 2016 liquid cellulosic biofuel projection methodology was arbitrary and capricious because EPA's prior projections significantly overestimated the production of liquid cellulosic biofuel. Citing *American Petroleum Institute*, the Obligated Party Petitioners contend that EPA's continued use of a methodology that has failed to produce accurate projections was arbitrary and capricious. *See id.* at 477 ("a methodology used for prediction" can "look more arbitrary the longer it is applied" unsuccessfully) (emphasis omitted). That argument, however, is grounded on an incorrect premise: EPA's 2016 projection methodology has not been applied in the past. Rather, the majority of EPA's prior overestimations occurred following EPA's use of the methodology rejected in *American Petroleum Institute* – that is, one that systematically erred on the side of overestimation. *See id.* at 478. Nor does EPA's methodology track the 2014 cellulosic biofuel projection methodology originally proposed in the withdrawn 2014 rule (a methodology that the Obligated Party Petitioners contend resulted in overestimation of cellulosic biofuel production for the year 2014). *Compare* Final Rule, 80 Fed. Reg. at 77,499-508, *with* 2014 Standards for the Renewable Fuel Standard Program, 78 Fed. Reg. 71,732, 71,746 (Nov. 29,

2013); *see also* Tr. of Oral Arg. at 115. Therefore, contrary to the Obligated Party Petitioners' contention, this is not a situation in which EPA has arbitrarily refused to reconsider a projection methodology that has proven unsuccessful in the past.

*Third*, the Obligated Party Petitioners argue that EPA erred by relying on liquid cellulosic biofuel producers' own forecasts of their start-up dates. The Obligated Party Petitioners note that such facility-provided data has proved unreliable in the past. Perhaps so. But EPA took that into account. Rather than just blindly adopting the facilities' own forecasts, EPA performed its own investigation of each plant's ability to produce liquid cellulosic biofuel during the year 2016. *See* Final Rule, 80 Fed. Reg. at 77,500-01; Cellulosic Biofuel Producer Company Descriptions, Memorandum from Dallas Burkholder to EPA Air and Radiation Docket EPA-HQ-OAR-2015-0111 (Nov. 2015), J.A. 814; *see also* Final Rule, 80 Fed. Reg. at 77,504 (past experience "strongly suggests that we should view the individual company projections as something other than the most likely outcomes"). Then, in recognition of the challenges in the liquid cellulosic biofuel industry, EPA set the volume requirement for new liquid cellulosic biofuel producers with the assumption that the producers would produce at the lower end of their aggregate volume range. *See* Final Rule, 80 Fed. Reg. at 77,506 tbl.IV.E-5. In doing so, EPA reasonably accounted for the uncertainty and unreliability identified by the Obligated Party Petitioners.

*Fourth*, the Obligated Party Petitioners contend that EPA erred by utilizing a six-month "ramp-up" period when determining the companies' production ranges. But EPA supported its decision to use a six-month ramp-up period by citing the example of a company that had recently "achieved levels of production that met and in some cases exceeded the

nameplate capacity" for liquid cellulosic biofuels "within the expected six month ramp-up period." EPA Response to Comments on Final Rule, at 557 (Nov. 2015), J.A. 1005. EPA did not impose a six-month ramp-up period across the board, moreover. EPA instead set that six-month ramp-up period as an "optimistic" scenario that would determine the *high end* of a producer's volume range. Final Rule, 80 Fed. Reg. at 77,503. More importantly, if a company gave a volume projection lower than EPA's high-end volume projection, EPA chose to use the company's projection as the high end of the range. *Id.* at 77,504. Conversely, if the company's volume projection was higher than EPA's high-end volume projection, EPA stuck with its own projection as the high end of the range. *Id.* EPA's individualized approach to setting the "optimistic" production volume scenarios was reasonable.

*Fifth*, the Obligated Party Petitioners assert that EPA overstated the low end of the established liquid cellulosic producers' volume ranges by relying on data from the most recent 12 months of those facilities' operation. But EPA explained that relying on prior data would provide EPA with an "objective methodology for calculating the low end of the potential production range for each company." *Id.* at 77,503. Although EPA acknowledged that an unforeseen technical problem could prevent a producer from meeting the volume of liquid cellulosic biofuel it produced in the prior year, EPA concluded that it was reasonable to assume that a company's output would grow year-over-year as the company gained experience. *See id.* Moreover, EPA left room for "exceptions" to its reliance on prior years' data for those cases in which "available information indicates" that reliance on that data would be improper. *Id.* EPA therefore fulfilled its duty to articulate a "reasonable and reasonably explained" approach to setting the low end of the production ranges. *Communities for*

*a Better Environment v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014).

*Sixth*, the Obligated Party Petitioners argue that EPA failed to provide a reasoned explanation for its "percentile" methodology. That claim is off base. EPA explained the details of its percentile approach, including its decision to generate total volume ranges for each of the four groups of cellulosic biofuel producers. *See* Final Rule, 80 Fed. Reg. at 77,502-07. EPA stated that its approach was appropriate in light of the "uncertain and variable nature" of cellulosic biofuel production. *Id.* at 77,503. In addition, EPA explained how it chose the final volumes for each group of cellulosic biofuel producers: It selected volumes based on the differing "technology risk" and "challenges" faced by the types of companies within each group. *Id.* at 77,506. EPA's explanation therefore articulates a "rational connection between the facts found and the choice made" and is sufficient for purposes of our deferential arbitrary and capricious review. *State Farm*, 463 U.S. at 43.

*Seventh*, the Obligated Party Petitioners protest that EPA failed to generate a projection "based on" the cellulosic biofuel estimates provided by the Energy Information Administration. 42 U.S.C. § 7545(*o*)(3)(B)(i); *see also American Petroleum Institute*, 706 F.3d at 478 (EPA must give sufficient "respect" to Energy Information Administration estimates). As EPA noted, however, its cellulosic biofuel projections were "very similar" to those that were provided by the Energy Information Administration when the scope of EPA's projection was limited to the companies assessed by the Energy Information Administration. Final Rule, 80 Fed. Reg. at 77,501. EPA explained that the majority of the difference between EPA's projections and the Energy Information Administration's estimates was attributable to the fact that EPA examined a

larger number of cellulosic biofuel producers. *Id.* Indeed, the Energy Information Administration's estimates did not contain figures for compressed and liquefied natural gas production – production that accounts for the vast majority of cellulosic biofuel. *Id.* Given those considerations, we do not agree that EPA failed to generate projections "based on" the Energy Information Administration's estimates.

To sum up, we conclude that EPA's 2016 liquid cellulosic biofuel projection took a "neutral aim at accuracy" and was otherwise reasonable and reasonably explained for purposes of arbitrary and capricious review. We therefore reject the Obligated Party Petitioners' challenges to EPA's 2016 liquid cellulosic biofuel projection.

2

The Obligated Party Petitioners also argue that EPA's 2016 projection of biogas production was arbitrary and capricious for three reasons. We again disagree.

*First*, the Obligated Party Petitioners claim that EPA's "percentile" methodology is inadequately explained. That argument fails for the same reasons given in the previous section. EPA adequately explained its methodology, including: (i) EPA's decision to divide cellulosic biofuel producers into four groups; (ii) the way in which EPA calculated total volume ranges for each group; and (iii) EPA's use of the mid-point and three-quarter-point approach when calculating the volume requirement for each group of biogas producers. *See* Final Rule, 80 Fed. Reg. at 77,504-06. In addition, EPA reasonably explained that it chose to set the volumes at the mid-point and three-quarter-point for each set of producers based on data and comments it received as well as the fact that many of the biogas producers had commercial

experience generating biogas and employed well-tested technology. *Id.* EPA's explanation is reasonable for purposes of arbitrary and capricious review.

*Second*, the Obligated Party Petitioners argue that EPA's projections overlook the fact that many biogas producers are incapable of producing the type of transportation-grade cellulosic biofuel that is required to generate RINs and satisfy the Renewable Fuel Program's requirements. However, EPA limited its analysis of biogas producers to those producers that had the capacity to generate cellulosic biofuel RINs. *See* November 2015 Assessment of Cellulosic Biofuel Production from Biogas (2015-2016), Memorandum from Dallas Burkholder to Air and Radiation Docket EPA-HQ-OAR-2015-0111 (Nov. 2015), J.A. 821; *see also* Final Rule, 80 Fed. Reg. at 77,501 n.205. So that challenge fails.

*Third*, the Obligated Party Petitioners take issue with EPA's reliance on a biogas estimate provided by the Coalition for Renewable Natural Gas. But EPA noted that it did "not think it would be appropriate to simply adopt" the Coalition's projections. EPA Response to Comments on Final Rule, at 569 (Nov. 2015), J.A. 1017. EPA instead reached its own projections applying the reasonable projection methodology discussed above. So that claim is likewise without merit.[9]

---

[9] The Obligated Party Petitioners also ask this Court to remand the cellulosic biofuel projections to EPA because EPA failed to disclose critical information – namely, 2014 and 2015 production data for the separate categories of liquid cellulosic biofuel and biogas – when EPA promulgated the Final Rule. By statute, to prevail on that type of a procedural argument, the Obligated Party Petitioners must show that EPA's alleged failure to disclose that data was "so serious" that there is a "substantial likelihood that the rule would have been significantly changed if" EPA had disclosed the data. 42 U.S.C. § 7607(d)(8); *see id.* § 7607(d)(9)(D)(iii). The

We conclude that EPA's biogas projection for 2016 was reasonable and adequately explained. We therefore reject the Obligated Party Petitioners' arbitrary and capricious challenges to that projection.

V

In this section, we consider National Biodiesel Board's challenge to EPA's interpretation and use of its cellulosic waiver authority to lower the advanced biofuel volume requirements for the years 2014, 2015, and 2016. EPA interpreted the cellulosic waiver provision as granting the agency broad discretion to consider a variety of factors – including demand-side constraints in the advanced biofuels market – when determining whether to exercise its cellulosic waiver authority. National Biodiesel Board argues that EPA's interpretation is contrary to the statute. National Biodiesel Board also asserts that EPA's calculation of the volume of advanced biofuel likely to be available in 2016 was arbitrary and capricious. Both arguments are without merit.

A

As explained in the previous section, Congress enacted a number of provisions that EPA must follow when setting cellulosic biofuel volume requirements under the Renewable Fuel Program. EPA must first project the amount of cellulosic biofuel likely to be produced in the relevant calendar year. *See* 42 U.S.C. § 7545(*o*)(7)(D)(i). If that EPA projection falls short of the statutory volume requirement for cellulosic biofuel, then

---

Obligated Party Petitioners have failed to articulate how EPA's alleged error in omitting the 2014 and 2015 data satisfies that heightened standard.

EPA "shall reduce" the cellulosic biofuel volume requirement "to the projected volume available during that calendar year." *Id.*

EPA's reduction of the cellulosic biofuel volume requirement triggers its authority under the "cellulosic waiver provision." That provision states: "For any calendar year in which" EPA reduces the cellulosic biofuel volume requirement, EPA "may also reduce" the total renewable fuel and advanced biofuel volume requirements "by the same or a lesser volume." *Id.* The cellulosic waiver provision reflects the nested nature of the renewable fuel categories: Because cellulosic biofuel is a subcategory of advanced biofuel, a reduction to the cellulosic biofuel volume requirement leaves a gap in the supply of advanced biofuel available to satisfy the advanced biofuel volume requirement. *See id.* § 7545(*o*)(1)(B)(ii).

In the Final Rule, EPA determined that the cellulosic biofuel levels would fall short of the statutory requirements for the years 2014, 2015, and 2016. *See* Final Rule, 80 Fed. Reg. at 77,422; *see also* Part IV, *supra*.[10] As required by statute, EPA reduced the cellulosic biofuel volume requirements for those years. *See* Final Rule, 80 Fed. Reg. at 77,499. Specifically, EPA reduced the statutory volume requirements by 1.72 billion gallons for 2014; by 2.88 billion gallons for 2015; and by 4.02 billion gallons for 2016. *See id.* By statute, EPA's reduction of the cellulosic biofuel volume requirements meant that the agency had discretion to reduce the volume

---

[10] By the time EPA issued the Final Rule in December 2015, all of 2014 and most of 2015 had passed. For that reason, EPA chose to base its cellulosic biofuel "projections" for those years on the actual number of cellulosic biofuel RINs generated. *See* Final Rule, 80 Fed. Reg. at 77,439. We considered issues relating to EPA's late issuance of the Final Rule above in Part III.

requirements for advanced biofuel and total renewable fuel using its cellulosic waiver authority.

EPA noted that it had "broad discretion" to determine "when and under what circumstances" to use its cellulosic waiver authority. *Id.* at 77,434 (citing *Monroe Energy, LLC v. EPA*, 750 F.3d 909, 915 (D.C. Cir. 2014)). EPA stated, however, that it would reduce the advanced and total renewable fuel volume requirements through use of the cellulosic waiver authority only if it had a "substantial justification" to do so. *Id.* A "substantial justification" would exist, according to EPA, if EPA determined that the reduction in cellulosic biofuel would create a gap in the Nation's supply of renewable fuel that could not be filled with other (non-cellulosic) types of advanced biofuel. *Id.* To make that determination, EPA stated that it would consider a variety of factors, including supply-side constraints on the production and import of advanced biofuels as well as demand-side limitations on the ability of the market to use advanced biofuel. *See id.*

In the Final Rule, EPA considered those supply-side and demand-side factors. After doing so, EPA determined that "constraints (including distribution and infrastructure constraints) that limit the use of non-cellulosic advanced biofuels" would prevent those fuels from completely filling the gap created by the reduction in cellulosic biofuel. *Id.* According to EPA, because the market could not support consumption of the advanced biofuel volumes required by the statute, setting the volumes at the statutory targets would only lead to "noncompliance and/or additional petitions for a waiver of the standards." *Id.* at 77,442. EPA therefore decided to use its cellulosic waiver authority "to reduce the advanced biofuel applicable volume to a level" that the agency determined "to be reasonably attainable" in the renewable fuel market. *Id.* at 77,434. Specifically, EPA reduced the statutory volume of

advanced biofuel by 1.08 billion gallons for 2014; by 2.62 billion gallons for 2015; and by 3.64 billion gallons for 2016. *Compare id.* at 77,424 tbl.I.A-1, *with id.* at 77,432 tbl.II-1.

National Biodiesel Board challenges EPA's interpretation and use of its cellulosic waiver authority to reduce the advanced biofuel requirements. National Biodiesel Board also contends that EPA's calculations of the supply of advanced biofuel likely to be available in 2016 were arbitrary and capricious. We now address, and reject, those arguments in turn.[11]

B

We first consider National Biodiesel Board's challenge to EPA's interpretation and use of its cellulosic waiver authority. National Biodiesel Board argues that EPA's interpretation – under which EPA considered demand-side constraints in the market for advanced biofuels when considering whether to make reductions under the cellulosic waiver provision – exceeds EPA's statutory authority. We do not agree.

This Court previously considered the scope of the cellulosic waiver provision in *Monroe Energy, LLC v. EPA*,

---

[11] In "prior actions," EPA interpreted the cellulosic waiver provision "as authorizing EPA to reduce both total renewable fuel and advanced biofuel, by the same amount, if EPA reduces the volume of cellulosic biofuel." Final Rule, 80 Fed. Reg. at 77,433. EPA therefore reduced the volume requirements for total renewable fuel by the same amounts as it reduced the volume requirements for advanced biofuel. *Id.* at 77,434. National Biodiesel Board does not challenge that facet of EPA's interpretation of the cellulosic waiver provision nor EPA's reduction of the total renewable fuel volume requirements. We therefore focus on EPA's reduction of the advanced biofuel statutory volume requirements.

750 F.3d 909 (D.C. Cir. 2014). The Court noted that, in contrast to other EPA waiver authorities, the text of the cellulosic waiver provision does not "prescribe any factors that EPA must consider in making its decision" about whether to use its cellulosic waiver authority. *Id.* at 915. Given "the absence of any express or implied statutory directive to consider particular factors," the *Monroe Energy* Court said that EPA "reasonably concluded that it enjoys broad discretion regarding whether and in what circumstances to reduce the advanced biofuel and total renewable fuel volumes under the cellulosic biofuel waiver provision." *Id.* Applying that principle, the Court approved EPA's decision to consider the "ability of" advanced biofuels "to be consumed" in the market when determining whether to exercise its cellulosic waiver authority. *Id.* at 916.

Citing *Monroe Energy*, EPA asserts that its interpretation of the cellulosic waiver provision – including EPA's reading of the provision as granting it authority to consider demand-side constraints on the market for advanced biofuels – is permissible under the statute.

National Biodiesel Board disagrees. It states that EPA's interpretation of the cellulosic waiver provision circumvents the limits that Congress placed on EPA's authority. According to National Biodiesel Board, EPA's discretion under the cellulosic waiver provision is limited by the other waiver provisions in the statute – including, as relevant here, the "inadequate domestic supply" prong of EPA's general waiver provision. *See* 42 U.S.C. § 7545(*o*)(7)(A)(ii). Under National Biodiesel Board's reading of the cellulosic waiver provision, EPA has the authority to reduce the advanced biofuel volume requirements if – and only if – there is an inadequate *supply* of advanced biofuel in the market to meet those statutory volumes. National Biodiesel Board argues that EPA cannot

consider demand-side constraints on the ability of the market to consume advanced biofuel because doing so would contravene the limitations in EPA's general waiver provision.

In our view, EPA has the better of the argument. The text of the cellulosic waiver provision, the structure of the Renewable Fuel Program, and this Court's decision in *Monroe Energy* all point in the same direction: The cellulosic waiver provision grants EPA "broad discretion" to consider a variety of factors – including constraints on the demand for advanced biofuel – when determining "whether and in what circumstances" to reduce the advanced biofuel volume requirement. *Monroe Energy*, 750 F.3d at 915.

We start with the text of the cellulosic waiver provision. That text places only one limitation on EPA's cellulosic waiver authority: Any reduction EPA makes to the advanced biofuel or total renewable fuel volume requirements may not exceed the amount of EPA's reduction to the cellulosic biofuel volume requirement. *See* 42 U.S.C. § 7545(*o*)(7)(D)(i). Beyond that, the provision does not "prescribe any factors that EPA must consider in making its decision" to lower the advanced biofuel or total renewable fuel volume requirements. *Monroe Energy*, 750 F.3d at 915. Where, as here, "a statute is silent with respect to *all* potentially relevant factors, it is eminently reasonable to conclude that the silence is meant to convey nothing more than a refusal to tie the agency's hands." *Id.* (quoting *Catawba County v. EPA*, 571 F.3d 20, 37 (D.C. Cir. 2009)).

Structural considerations also support EPA's reading of the cellulosic waiver provision. As just discussed, the cellulosic waiver provision does not contain "any express or implied statutory directive to consider particular factors." *Id.* By contrast, other waiver provisions in nearby subsections of the statute detail the considerations and procedural steps that

EPA must take before waiving fuel requirements. *See, e.g.*, 42 U.S.C. § 7545(*o*)(7)(A) (EPA may lower total renewable fuel volumes based on determination "after public notice and opportunity for comment" (i) that requirements would "severely harm the economy or environment of a State, a region, or the United States" or (ii) that there is "inadequate domestic supply" of renewable fuel); *id.* § 7545(*o*)(7)(E)(ii) (EPA may lower biomass-based diesel requirements upon determination "that there is a significant renewable feedstock disruption or other market circumstances that would make the price of biomass-based diesel fuel increase significantly"). In addition, even though the cellulosic waiver provision cross-references two other statutory provisions, it does not cross-reference or otherwise incorporate by reference any limitations on EPA's waiver authority. *See id.* § 7545(*o*)(7)(D)(i). The fact that Congress knew how to cabin EPA's discretion or reference other statutory provisions when it wanted to do so – and did not pursue either of those "ready alternative[s]" in the cellulosic waiver provision – further confirms that the cellulosic waiver provision means what it says. *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659, slip op. at 8 (2017).[12]

---

[12] National Biodiesel Board counters with a structural argument of its own. Positing that "Congress presumably intended" the general waiver provision and cellulosic waiver provision "to harmonize without specifically cross-referencing the two," National Biodiesel Board contends that EPA's interpretation must be wrong because it renders the "inadequate domestic supply" prong of the general waiver provision superfluous. National Biodiesel Board Reply 4. National Biodiesel Board is correct that our reading of the cellulosic waiver provision allows EPA to reduce the advanced biofuel or total renewable fuel volume requirements based on factors it cannot consider for purposes of the "inadequate domestic supply" provision. But that result follows from the fact that Congress chose

Our precedents accord with the text and structure of the statute. Observing that the text of the cellulosic waiver provision does not direct EPA to "consider particular factors," the *Monroe Energy* Court held that EPA enjoys broad discretion regarding "whether and in what circumstances to reduce the advanced biofuel and total renewable fuel volumes" under the cellulosic waiver provision. 750 F.3d at 915. Applying that interpretation, the Court approved EPA's decision to consider "the ability of" advanced biofuels "to be consumed" for purposes of determining whether to exercise the cellulosic waiver authority. *Id.* at 916; *see also id.* (EPA permissibly considered "the constraints imposed by the E10 blendwall" when deciding whether to use cellulosic waiver authority). That same reasoning controls here: EPA had discretion to consider "a range of factors" in determining whether to exercise its cellulosic waiver authority, including demand-side constraints that affect "the ability" of advanced biofuels "to be consumed." *Id.*

National Biodiesel Board attempts to distinguish *Monroe Energy* on the basis that EPA in that case *declined* to use its cellulosic waiver authority. National Biodiesel Board points out that courts generally give more deference to an agency's failure to act than to an agency's decision to act, and that *Monroe Energy* should be read in light of that principle. *See* Tr. of Oral Arg. at 31 (citing *Heckler v. Chaney*, 470 U.S. 821 (1985)). According to National Biodiesel Board, this Court should adopt a different rule for cases in which EPA chooses to make reductions under the cellulosic waiver provision.

---

to grant EPA two textually distinct waiver authorities that operate in different scenarios pursuant to different limitations.

We are not persuaded. Nothing in the *Monroe Energy* Court's discussion of the cellulosic waiver provision turned on the fact that EPA was declining to exercise its authority in that case. Rather, the Court relied on the text of the cellulosic waiver provision itself, which grants EPA "broad discretion regarding whether and in what circumstances *to reduce* the advanced biofuel and total renewable fuel volumes under the cellulosic biofuel waiver provision." *Monroe Energy*, 750 F.3d at 915 (emphasis added). Neither the text of the cellulosic waiver provision – nor the *Monroe Energy* Court's interpretation of that text – supports the position that EPA's cellulosic waiver authority is narrower when EPA actually wants to use it.

National Biodiesel Board's argument boils down to the contention that "any result consistent with" its "account of the statute's overarching goal must be the law." *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725, slip op. at 9 (2017). We take a different approach, instead presuming that "the legislature says what it means and means what it says." *Id.*, slip op. at 10 (internal quotation mark and alterations omitted). Applying the cellulosic waiver provision that Congress chose to enact, we conclude that EPA's decision to lower the advanced biofuel volumes for the years 2014, 2015, and 2016 was within the agency's discretion and otherwise lawful.[13]

---

[13] National Biodiesel Board also contends that EPA erred because it determined the amount of advanced biofuel available in the market only after determining the appropriate requirements for total renewable fuel. That is not accurate. EPA explained that its "assessment of the use of the cellulosic waiver authority alone focused on a case in which advanced biofuel and total renewable fuel are both reduced only to the degree necessary to yield an appropriate volume of advanced biofuel." Final Rule, 80 Fed. Reg. at 77,443. Based on an analysis of the projected production and import of

C

On the way to determining whether to use its cellulosic waiver authority, EPA calculated the volume of advanced biofuel that was "reasonably attainable" in the market in 2016. Final Rule, 80 Fed. Reg. at 77,476. EPA did so by taking into account supply-side and demand-side constraints in the markets for different types of advanced biofuel, including (i) advanced ethanol, the largest source of which is sugarcane ethanol from Brazil, and (ii) advanced biodiesel and renewable diesel. National Biodiesel Board raises three arbitrary and capricious challenges to EPA's calculation of the volume of advanced biofuel "reasonably attainable" in the market in 2016. National Biodiesel Board argues that: (i) EPA failed to articulate a clear standard for setting advanced biofuel volumes; (ii) EPA provided no support for its assessment of projected imports of sugarcane ethanol from Brazil; and (iii) EPA did not address data showing that biomass-based diesel was available in greater volumes than EPA estimated.

To survive arbitrary and capricious review, as we have said, an agency decision must be "reasonable and reasonably

---

advanced biofuel, as well as market constraints on the ability of advanced biofuel to be used, EPA determined that the "reasonably attainable" supply of advanced biofuel in 2016 was 3.61 billion gallons – an amount that was 3.64 billion gallons short of the statutory volume of advanced biofuel. *See id.* at 77,443-44. Only after deriving the advanced biofuel projection did EPA reduce the advanced biofuel statutory volume amount to match that projection. EPA then explained that it was making the same 3.64 billion gallon reduction to the total renewable fuel volume requirement. *See id.* at 77,444 & tbl.II.B.6-1. It was therefore the available volumes of advanced biofuel – not total renewable fuel – that drove EPA's cellulosic waiver decision. *Id.* at 77,443.

explained." *Communities for a Better Environment v. EPA*, 748 F.3d 333, 335 (D.C. Cir. 2014); *see also Motor Vehicle Manufacturers Association of United States, Inc. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983) (An agency "must examine the relevant data and articulate a satisfactory explanation for its action."). Applying that deferential standard, we reject National Biodiesel Board's arguments.

*First*, we disagree with National Biodiesel Board that EPA failed to reasonably explain its standard for setting advanced biofuel volumes. National Biodiesel Board focuses on EPA's statement that it was setting the advanced biofuel volume requirement at a "reasonably attainable" level, as if that were the only explanation given by EPA in the Final Rule. But EPA explained at length the various factors it considered when calculating the "reasonably attainable" volume of advanced biofuel, including, among other things: (i) the quantity of feedstock available to produce advanced biofuel, *see* Final Rule, 80 Fed. Reg. at 77,466; (ii) production capacity of the facilities capable of producing advanced biofuel, *see id.* at 77,467; (iii) advanced biofuel import capacity, *see id.* at 77,467-69; and (iv) the market's capacity to produce, distribute, and consume biomass-based diesel, *see id.* at 77,470-75. EPA's detailed explanation of its method for determining the "reasonably attainable" volume of advanced biofuel was "satisfactory," to say the least. *State Farm*, 463 U.S. at 43.

*Second*, we reject National Biodiesel Board's argument that EPA acted unreasonably by failing to explain its projection of the amount of sugarcane ethanol that was likely to be imported from Brazil in 2016. According to National Biodiesel Board, EPA erred when it concluded that only 200 million gallons of sugarcane ethanol would be imported from Brazil.

National Biodiesel Board argues that EPA's projection placed too much emphasis on the "low levels of imports seen in 2014 and 2015" because no advanced biofuel standards were in place for those years – a fact that drove down advanced biofuel imports. Final Rule, 80 Fed. Reg. at 77,478. EPA did point to data showing that imports of sugarcane ethanol from Brazil were on the decline, having reached only 64 million gallons in 2014 and approximately 55 million gallons in 2015. But EPA did not rely solely on that historical data to reach its projections. Rather, EPA examined a number of factors affecting Brazil's exports of sugarcane ethanol into the United States. Those factors included "total gasoline consumption in Brazil," which EPA explained was outpacing the growth rate of sugarcane ethanol production, as well as the "worldwide demand for sugar." *Id.* at 77,477, 77,478. Citing all of those considerations, EPA concluded that "a somewhat lower level of imports will occur than the historic average" of 300 million, and EPA opted to set the projection at 200 million instead. *Id.* at 77,478. That conclusion was "reasonable and reasonably explained" for purposes of arbitrary and capricious review. *Communities for a Better Environment*, 748 F.3d at 335.

*Third*, we disagree with National Biodiesel Board that EPA's projection of the available amounts of biomass-based diesel was arbitrary and capricious. National Biodiesel Board's basic contention on this point is that EPA ignored factors showing that the market could supply a higher volume of biomass-based diesel than the volume determined by EPA. In particular, EPA allegedly overlooked factors related to biomass-based diesel production capacity, import capacity, distribution capacity, and consumption capacity.

On the contrary, however, EPA did discuss "the many different factors that may constrain the supply of biodiesel and renewable diesel in 2016." Final Rule, 80 Fed. Reg. at 77,466.

EPA explained that production capacity was constrained by the limited availability of biomass-based diesel feedstock and by the middling utilization rates of biomass-based diesel production facilities. *See id.* at 77,466-67. EPA also explained its considerations regarding import capacity. Although EPA conceded that the amount of biodiesel imports "is difficult to predict," EPA walked through a number of factors to support its projection of biomass-based diesel imports. *Id.* at 77,468. Those factors included, among other things: historical data on imports; the considerations that would lead other countries to export their fuel to the United States; and whether the imports from foreign countries would qualify as biomass-based diesel. *See id.* at 77,468-70. EPA also discussed the assorted constraints on distribution capacity – such as limitations on transporting biodiesel through existing pipelines, the need for specialized storage facilities to preserve biodiesel in winter months, and the minimal number of retailers that sell biodiesel – that prevent biomass-based diesel from getting to consumers. *See id.* at 77,470-71. Finally, EPA noted that many engine manufacturers do not warrant the use of certain biomass-based diesel fuels, a fact that further constrains the consumption of biomass-based diesel by consumers. *Id.* at 77,471-72.

EPA's analysis, more of which appears in the Final Rule, demonstrates that EPA fulfilled its duty to "examine the relevant data and articulate a satisfactory explanation for" its biomass-based diesel projections, "including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted). In such a situation, this Court "is not to substitute its judgment" (nor National Biodiesel Board's) "for that of the agency." *Id.*

We conclude that EPA's calculation of the volume of advanced biofuel "reasonably attainable" in the market in 2016 was not arbitrary or capricious. Final Rule, 80 Fed. Reg. at

77,476.  We reject National Biodiesel Board's arguments to the contrary.

## VI

The final issue raised by the Obligated Party Petitioners is whether EPA was required to consider the appropriateness of the current "point of obligation" – that is, EPA's choice to apply the statute's renewable fuel requirements to refiners and importers, but not blenders – in the Final Rule.

The Obligated Party Petitioners argue that EPA's failure to reconsider the point of obligation requires us to remand the Final Rule to the agency.  But we need not decide whether a remand is required because, as discussed in Part II, we are already remanding the Final Rule to EPA for further proceedings in light of our interpretation of the "inadequate domestic supply" waiver provision.  With the Final Rule back before the agency, EPA will have an opportunity to address the Obligated Party Petitioners' arguments regarding the point of obligation.  In addition, EPA is currently considering comments on its proposed denial of a set of petitions – petitions filed by some of the Obligated Party Petitioners – seeking reconsideration of EPA's current point of obligation regulation.  *See* Notice of Opportunity to Comment on Proposed Denial of Petitions for Rulemaking to Change the RFS Point of Obligation, 81 Fed. Reg. 83,776 (Nov. 22, 2016).  Given the stage of that proceeding, we leave it up to EPA to determine whether to address the point of obligation issue there, on remand in this case, or in both proceedings.

\* \* \*

We agree with Americans for Clean Energy that the statute forecloses EPA's reading of the "inadequate domestic supply"

waiver provision. We therefore grant Americans for Clean Energy's petition for review of the 2015 Final Rule, vacate EPA's decision in the Rule to reduce the total renewable fuel volume requirements for 2016 through use of the "inadequate domestic supply" waiver authority, and remand the rule to EPA for further consideration in light of our interpretation.

We have considered all of the parties' other arguments and have found them to be without merit. We deny the remainder of the petitions for review.

*So ordered.*